countries, they are very careful not to assume duties or perform acts that would imply a purpose to resume their former allegiance. And thus, while living beyond the reach of the authority of our government —without ever having identified themselves with it, and without ever having contributed any thing to its support—they successfully invoke its power to shield them from the ordinary burdens of citizenship in the country of their residence.

"An effective remedy for such abuses is not possible, except by some well digested scheme of congressional legislation. There should be some explicit declaration by Congress of the conditions under which citizens of the United States shall be deemed to have expatriated themselves; and when a man, in a foreign country, demands protection as an American citizen, he should be required to produce some better evidence of his nationality than that afforded by the certificate of a petty municipal magistrate who, although he may have common law jurisdiction, and 'a seal and clerk,' usually obtains his office as a reward for some supposed political service at the primaries, and holds it by the extremely uncertain tenure of the popular will.            WILLIAM L. SCRUGGS."

---

ALVIN HULBERT *vs.* R. M. DOUGLAS *et al.*

*Supreme Court of North Carolina.  Filed —— 1886.*

NEGOTIABLE INSTRUMENT.  NOTICE.  NO EVIDENCE.  AGENT.  1. If the endorsee of a negotiable instrument before its maturity knew, or if such facts came to his knowledge, which, if inquired into, would have informed him of an equity of the maker, he takes the instrument *cum onere.*

2. Where a negotiable note is secured by a mortgage, the fact that one-half the land has been released, is some evidence to charge a purchaser of the note before maturity with notice that there has been a partial payment on the note.

3. If anything appears to a party calculated to attract attention or stimulate inquiry, the person is affected with knowledge of all that the inquiry would have disclosed.

4. Notice to an attorney of any matter relating to the business in which he is engaged for his client, is notice to the client.

5. Where an attorney sold a note to a person who was occasionally his client, and such attorney, acting for the purchaser, investigated the title to the land on which the note was secured by a mortgage, and was afterwards employed by the purchaser to bring suit on, and collect the note; *It was held,* to be some evidence that the attorney was acting for the purchaser in the sale of the note.

(Dupree *vs.* Ins. Co., 92 N. C., 417; Bunting *vs.* Ricks, 2 Dev. & Bat. Eq., 130, cited and approved.)

Civil action, tried before Gilmer, Judge, and a jury, at August Term, 1885, of the Superior Court of Guilford county.

The defendant Robert M. Douglas, for the purpose of obtaining a loan of money, on the 20th day of May, 1879, executed to the other defendant, Thomas B. Keogh, his promissory note, in the sum of $7,000, payable at five years, and bearing ten per cent. interest from date, which interest was represented by five several coupons, each of $700, due annually; and to provide ample security therefor, conveyed five acres of land in Chicago, where the loan was expected to be obtained, to his brother, Stephen A. Douglas, as trustee.

To effectuate the negotiation under this arrangement, Keogh proceeded to Chicago, and failing in his effort, obtained an advance of $2,500 from one Myron A. Decker, acting in an agency not then disclosed, but afterwards it appeared to be on behalf of his wife, on the deposit of the note and deed in trust with him as collateral security for said sum. On his return to Greensboro and reporting his want of success, Keogh purchased from Douglas the note with coupons and deed in trust, by surrendering to the latter notes held against him, the payment of $1,300 in money, and giving his own note for the residue of the purchase money of $200. This agreement was made and carried out on July 18th, 1879, whereby, subject to liability for the sum advanced, the securities became the property of Keogh. After the assignment, and in the fall of the same year, Douglas, desiring to have one-half the land, so conveyed, exonerated, obtained the consent of Keogh thereto, on condition that Decker also assented, and further that Douglas should pay Keogh $4,000 on the note, and as soon as relieved, that he should sell the remaining half still charged with the debt, and deposit in bank at Chicago so much of the proceeds of such sale as would be sufficient to discharge the entire indebtedness. This arrangement was concurred in by Decker, and in February, 1880, Douglas paid to Keogh the agreed sum of $4,000 on the $7,000 note, taking a receipt expressing that it was to be credited on it, then still held by Decker. The payment of the $4,000 to Keogh was afterwards personally made known to Decker by Douglas, as also the release of half the land from the trust deed, and of his contract to sell the other half and make the money deposit in bank sufficient to discharge the whole debt and interest. At the same time they conferred as to the best method of disposing of that portion of the land. In the fall of the year, Douglas effected the sale, deposited in the bank $3,800 (the amount of the note and coupons on their face then payable), a sum sufficient to pay the balance of the debt and interest to December 1st, 1880, and the further sum of $200 to meet contingencies, of all which both Keogh and Decker had notice.

The deposits were made in the name of the trustee, with directions to make the payments. Keogh did not apply the $4,000 paid as a credit

on the note, it not being in his possession at the time, but appropriated the amount to other alleged indebtedness of Douglas to him; and about June, 1880, having separated the first over-due coupon, placed the note with all the other coupons in the hands of Decker, to be disposed of for him, without entering the credit or informing him of the $4,000 payment. They were accordingly sold to the present plaintiff in August of the same year for the sum of $7,080, and the note, with over-due coupons, endorsed and delivered to the plaintiff. In this transaction Decker acted as agent of Keogh only, as he testifies. The second coupon becoming due, the note, with it attached, was presented at the bank and payment of the coupon then maturing, to wit, on May 21st, 1881, demanded, and payment being refused, it was protested and notice thereof given the defendants.

The present action was begun on July 25, 1881, and is prosecuted to recover the sum of $700, due on the second maturing coupon, with interest from date of maturity.

A single contested issue was submitted to the jury:—Did the plaintiff purchase the note sued on, for value and in good faith, before it was due, and without any notice of any defence, set-off or equities in favor of defendant Douglas, as set forth in his answer?

The jury to this inquiry answer: No.

There was a judgment on the verdict for the defendant Douglas, and the plaintiff appealed.

Messrs. Batchelor & Devereux, for the plaintiff.

Messrs. Graham & Ruffin (Messrs. Dillard & Morehead were with them on the brief), for the defendant Douglas.

Smith, C. J. (after stating the case). It is manifest that if the plaintiff knew, or such facts came to his knowledge as ought to have put him on inquiry, or which, if prosecuted, would have conveyed the information, before he purchased the security, of the $4,000 partial payment received by the payee from the defendant Douglas, with the express agreement that it should be appropriated to the note, and be entered as a credit thereon, he would take it *cum onere,* and the deposit left in the bank would operate as a discharge of the maker. If the plaintiff had no such knowledge, actual or constructive, the note and coupons, not being due, would pass into his hands, as if no such partial payment had been made. The possession of this information by Decker, seems not to have been questioned, but the evidence offered to prove the fact was objected to by the plaintiff's counsel, as incompetent to affect the rights transmitted in the endorsement to him, and was admitted by the court, with the declaration that it would be with-

drawn from the jury, unless the plaintiff's connection with it should be afterwards shown. This evidence was not afterwards withdrawn from the jury, and the plaintiff's counsel insisted then, as he does now, that it had not been shown that the plaintiff had direct or constructive notice of the payment to Keogh; and that the notice to Decker was not notice to the plaintiff, unless the former was the agent of the latter, of which no proof had been offered.

The controversy is thus narrowed down to a single inquiry, whether the plaintiff had information himself, or is chargeable with that possessed by Decker as his agent or attorney, which, if properly followed up, as a prudent man of business in the management of his affairs is expected to do, would have led to the discovery of the payment and the equity that springs from it.

Was there any such evidence laid before the jury which could warrant their verdict? The deed at first conveyed five acres of land, two and a half of which were relieved of the trust, and this the plaintiff ascertained before his purchase, and also examined the land itself. In his testimony, he said he did not himself examine the abstract of title, adding, " I understood my attorney examined it," and when asked " Who ?" replied, " I instructed Mr. Decker to do so " Yet, in answer to the question, " Was he acting as your attorney at that time ?" he said, " No, sir; but he has been my attorney in several transactions. This was only an investment I made."

He testifies that he understood that Decker was selling for Keogh, and his recollection is that the draft he gave in payment was in favor of Keogh ; that he told Decker to collect the notes, and directed him " to bring suit on the coupon in North Carolina."

While thus speaking the witness denies positively that Decker was his agent, or that he had information of the $4,000 payment.

The testimony of Decker, an attorney at law, is to the effect that he negotiated the sale, and did not mention any infirmities or equities which could affect the title to the notes assigned to the plaintiff, nor did he know or hear from any one that any such existed.

The plaintiff's evidence is somewhat confused, yet we cannot say that his knowledge of a diminution in value of the security by one-half, and for no apparent reason, would not suggest some correspondent reduction in the secured debt, which would put a prudent man on inquiry as to the reason of the withdrawal of half of the land. Nor is it clear that Decker did not act as well for the endorsee as for the endorser in bringing about the transfer.

Slight though the evidence might be, it would derive some force from the conflicting statements of the plaintiff himself as to the agency

of Decker, and whether he did not act for both the contracting parties in the sale.

Again, Decker, in reference to his being the plaintiff's attorney, says, " I can't say that I am his general attorney and adviser. . . . I have done a good deal of business for him. . . . At the time the paper was sold to him I was his attorney in some matters, and I knew of his having other suits in which I was not his attorney."

We cannot sustain the plaintiff's contention that there was no evidence of the agency of Decker, exercised on behalf of the plaintiff in the transaction under examination, of the sufficiency of which to establish the fact the jury alone are the judges.

Nor do we propose to re-enter the field of controversy opened in the argument for the plaintiff, as to the extent to which information acquired by an agent or attorney, before and outside of the sphere of his agency, is to affect his principal, since we have so recently laid down the principle which governs, in Dupree *vs.* Insurance Company, 92 N. C., 417, and we see no reason for departing from it.

" Constructive notice from the possession of the means of knowledge," remarks Ruffin, C. J., " will have that effect ('convert one into a trustee,') although the party were actually ignorant, but ignorant merely because he would not investigate. It is well settled that if anything appears to a party calculated to attract attention or stimulate inquiry, the person is affected with knowledge of all that the inquiry would have disclosed." Bunting *vs.* Ricks. 2 D. & B. Eq., 130 ; 2 Pom. Eq. Jur., § 608.

While the evidence which connects Decker with the plaintiff as his agent, in the negotiation, is very slight, and in opposition to repeated averments from both in their depositions, that he was not, in support of which the purchase at full value is strong confirmatory evidence, Decker was such attorney for the plaintiff in many matters, was intrusted to collect the present demand, and, though denied by him, the defendant's testimony tends to prove that he was fully informed of the part payment early in 1880, and yet he disposes of the security to the plaintiff, without any intimation of this fact, and as a claim, upon which the whole amount expressed upon its face to be due, was in truth due.

But of the relations of the agent, intermediate between the seller and purchaser, the jury were the judges upon the evidence, and there was some such, as in the examination of the abstract of title and the plaintiff's employment of Decker to make it, and his proceeding with the collection of the claim in suit, of a larger agency in the negotiation itself.

We do not, therefore, feel at liberty to interfere with a verdict rendered under this condition of the proofs, by declaring to be error the ruling that there was evidence proper to be passed on by the jury.

There is no error.

No error.   Affirmed.