The plaintiff instituted an action in behalf of himself and other taxpayers of the city of Kinston against the city of Kinston, the mayor, chairman of water and light committee, the city clerk, and the superintendent *Page 73 
of the water and light department of said city, alleging that the said municipality owns and operates its electric light plant and water supply system and is about to expend more than $100,000 for installation of an additional unit for said plant for the purpose of supplying electric current to customers outside the city. It is further alleged that the present plant is adequate for supplying the needs of the inhabitants within the city. It was further alleged that the officers of the city had unlawfully diverted from the sinking fund created for the purpose of paying the interest and principal of bonds heretofore issued the sum of $80,000 for the purpose of using the same in constructing an additional unit to the light and power plant.
The defendant filed an answer alleging that the present electric and power plant of the municipality was inadequate to meet the needs of the inhabitants of the city and that enlargement of same was necessary for the protection of life and property of the citizens of said city, and that while a small amount of electricity was furnished to outlying communities that the amount so furnished was negligible so that if such service should be discontinued the hazard of inadequate equipment would still constitute a menace to the inhabitants of the city. It was further alleged in the answer that the said sum of $80,000 was never a part of the sinking fund of the city, but was placed therein by the city clerk improperly for the convenience of bookkeeping.
A preliminary injunction was issued and the cause was heard on 27 February, 1930.
The judgment contains all facts essential to the determination of the questions of law involved and said judgment is as follows:
"The above entitled civil action coming on to be heard on this 27 February, 1930, the return day named in the temporary restraining order, both plaintiffs and defendants being represented, and the court having heard all evidence offered and argument of counsel, from said evidence the court finds the following facts, to wit:
1. That the plaintiff is a resident and taxpayer of the defendant, city of Kinston.
2. The defendant, city of Kinston, is a municipal corporation, in the county of Lenoir; and the other defendants are officers of the city as indicated by their titles and as shown in the complaint.
3. The defendant, city of Kinston, owns and operates its electric light and power plant; the electric generating equipment consisting of one 1500 K. W. turbo-generator and two 300 K. W. generator and engines.
4. The city of Kinston at various times and under various acts of the General Assembly, both private and public, has issued various bonds maturing at different dates. The affidavit of W. B. Coleman herein filed contains a true and correct schedule of the bonded indebtedness of *Page 74 
the city of Kinston as of 31 May, 1929, and the statutes under which the said bonds are issued. As explained in said affidavit, some of the bonds have been paid off and discharged since 31 May, 1929, the date upon which the said schedule was made up, being all the bonds maturing since that date.
5. On 1 June, 1928, there was in the hands of the treasurer of the city of Kinston the sum of $52,993.52, being the proceeds collected from taxes levied to create a sinking fund for the retirement of bonds; on 1 June, 1928, there was in the hands of the treasurer of the city of Kinston the sum of $5,031.29, being taxes collected and special assessments paid pursuant to chapter 202 of the Private Acts of 1913; on 1 June, 1928, there was in the hands of the treasurer of the city of Kinston the sum of $4,021.28, being taxes collected and special assessments paid pursuant to chapter 56 of the Public Laws of 1915; on 1 June, 1928, there was in the hands of the treasurer of the city of Kinston the sum of $5,595.78, being taxes collected and special assessments paid pursuant to chapter 56, Public Laws of 1915, and carried in account number 2. The said sums, aggregating $67,641.87, were collected from taxes and special assessments for sinking fund purposes to retire the bonded indebtedness of the city of Kinston.
6. On 1 June, 1928, there was in the hands of the treasurer of the city of Kinston the sum of $126,699.03, profits accumulated from the operation of the electric light and water system of the city of Kinston.
7. The board of aldermen of the city of Kinston held a regular meeting on 2 July, 1928. Among other business attended to was business relating to the sinking fund and the following appears from the minutes thereof:
"City clerk reports the financial condition showing a sinking fund in excess of water and light sinking fund, also recommends that the city take certificate of deposit in the amount of $120,000, equally divided among the three banks of the city. It was moved and duly seconded that the recommendations be accepted and so ordered." The amount referred to as being "in excess of $194,000" is made up of the amounts herein found to be on hand 1 June, 1928, aggregating $194,340.90.
Acting under the instructions of the board of aldermen, the clerk of the city of Kinston set up upon his books a sinking fund account. Warrants were issued against the amount for $120,000, which warrants were turned over to the various banks of the city of Kinston and certificates of deposit taken therefor. The city of Kinston now holds certificates of deposit representing this amount, which certificates have been issued in renewal of the original certificates. The balance of the said sinking fund account was carried as a cash balance so as to have a fund upon which checks could be issued for the payment of maturing bonds. *Page 75 
9. Since 1 June, 1928, the city of Kinston has collected on account of taxes levied for a sinking fund and special assessments various amounts, and since said date all maturing bonds have been taken care of and paid off either from the money on hand in the sinking fund or from collections made for that purpose, there being now in the hands of the treasurer of the city of Kinston certificates of deposit for $160,000 and cash on hand, on general deposit, of $22,541.37 for sinking fund account.
10. In addition to the $160,000 represented by certificates of deposit and the cash balance of $22,541.37, there is also due the sinking fund for past due paving assessments $14,108.30, and taxes levied for sinking fund purposes, but uncollected, $14,581.88, making the total sinking fund of $211,231.55. That in addition to this amount, there is also in hand $7,732.61 collected pursuant to chapter 202 of the Private Laws of 1913; $4,827.54 collected pursuant to chapter 56 of the Laws of 1915, and $3,412.02 collected pursuant to chapter 56 of the Public Laws of 1915, being account number 2, on account of special assessments, to retire outstanding serial bonds.
11. There is in the hands of the treasurer of the city of Kinston, represented by certificates of deposit or cash on account current, and set aside for sinking fund purposes and uncollected paving assessments and uncollected taxes for sinking funds, more than sufficient money with which to pay all bonds of the city of Kinston maturing prior to and including 1 January, 1935, other than certain serial bonds, the payment of which is required to be provided by taxes levied for that purpose and special assessments.
12. The facts in regard to the bonded indebtedness of the city of Kinston, the sinking fund account, how derived and when set apart, are set out in the affidavit of W. B. Coleman herein filed and these findings of fact. The said affidavit of W. B. Coleman is found to be true and correct.
13. That the charter of the city of Kinston contains, among others, the following provisions:
"Sec. 15. Ownership and regulation of public utilities. The right is hereby granted to the city of Kinston to own or to acquire by purchase its public utilities, such as gas, waterworks, electric lights and underground, surface and elevated street railways, subways or underground conduit system for electric light, power and other wires used for the purpose of transmitting any electric service: Provided, that no purchase or expenditures shall be made under this section unless the same shall first have been submitted to the vote of the qualified taxpaying voters at an election to be held exclusively for that purpose, and the right is hereby granted to the city of Kinston to regulate all public utilities in said city and to require an efficiency for public service, and to require *Page 76 
all persons or corporations to discharge the duties and undertakings for the purpose of which the respective franchises were made."
14. That the charter of the city of Kinston contains, among others, the following provision: "(3) All contracts of whatever character pertaining to public improvements or the maintenance of public property of the city of Kinston involving an outlay of as much as $2,000 shall be based upon specifications to be prepared and submitted to and approved by the mayor and city council, and after approval, advertisement of proposed work or improvement embraced in said proposed contract shall be made inviting competitive bids for the work proposed to be done, which advertisement shall be published once a week for four weeks in a newspaper published in the city of Kinston."
15. That the charter of the city of Kinston contains, among others, the following provision: "(23) In making up the budget allowance for any current year the city council shall first make provisions for the payment of the interest, the creation, setting aside and preservation of the legal sinking fund upon any or all of the outstanding indebtedness of the city, and, etc."
16. That the charter of the city of Kinston contains, among others, the following provision: "(Sec. 26). Taxation. The city council shall have the power, and it is hereby authorized, to levy annually for general purposes, and for the purpose of paying the interest and providing the sinking fund on the outstanding bonded indebtedness of the city of Kinston and for paying interest and making provisions for the sinking fund on such future bond issues as may be authorized an ad valorem tax on real or personal property within the corporate limits of the said city as defined in section 2 of this act, and on all personal property owned by residents of said city, including money on hand, solvent credits, and upon all franchises granted by the city to individuals or corporations and upon all other subjects taxed by the General Assembly a tax of not exceeding one dollar on every one hundred dollars appraised valuation of said property."
17. The board of aldermen of the city of Kinston has never taken any official action setting aside the sum of $80,000 represented by two certificates of deposit introduced in evidence, to the sinking fund account. The said sum of $80,000 was derived from profits of the electric light and water works system, which profits are additional to the profits represented by certificates of deposit for $120,000, which amount was set aside by the board of aldermen on 2 July, 1928. Such book entries as were made which indicate that the said sum of $80,000 was a part of the sinking fund were made by W. B. Coleman as clerk for his own convenience in bookkeeping and were never authorized or ratified by the board of aldermen. *Page 77 
18. On 4 November, 1929, the attention of the board of aldermen was called to this account, whereupon the resolution set out in the third paragraph of the fourth further defense was duly adopted and spread upon the minutes, which resolution is as follows, to wit:
"Resolution to direct the city clerk of the city of Kinston to transfer and separate from the sinking funds account of the city of Kinston the sum of $80,000, derived from operation of the water and light plants and improperly entered by the city clerk to the credit of the sinking fund account to another and proper account.
Whereas, it appears to the city council of the city of Kinston that the clerk is carrying in his general ledger an account under the heading of `Certificate of deposit for retirement of water and light bonds,' which account is intended to cover and does cover the sinking funds required by law to be held by the city of Kinston for the retirement of water and light bonds, paving assessments and sewerage bonds, and for graded school bonds; and,
Whereas, it further appears to the city council that the amounts of sinking funds which should now be on hand and held by the city of Kinston, as required by law, are as follows:
For water and light bonds, $120,000; for paving assessments and sewerage and graded school bonds, $40,000, and that the said amounts of $120,000 and $40,000 are on hand and held in the form of bank certificates of deposit, and that the said amounts constitute all the sinking funds required by law and by the provisions of any bonds or other engagements of the city of Kinston, and,
Whereas, it appears to the city council that the city clerk of his own motion, and without any direction from the city council or any other official of the city of Kinston, has also entered in said account the additional amount of $80,000, evidenced by bank certificates of deposit, which represent surplus from the operation of the water and light plants, which said amount constitutes no part of the sinking funds required by law, or by the provisions of any bonds or other engagements of the city of Kinston, and,
Whereas, said fund of $80,000 should be transferred and separated from said sinking funds of $120,000 and $40,000 respectively, as above set forth,
Now, therefore, be it, and it is hereby resolved by the city council of the city of Kinston that the city clerk be, and he is hereby directed to transfer the said amount of $80,000 of surplus so derived from the operation of water and light plants of the city, and which constitute no part of the sinking funds of the city, to a new account to be set up by the said city clerk in his general ledger under the heading of `surplus fund from operation of water and light plants,' or some such similar *Page 78 
heading as may be proper, to be held in such account for disbursement when and as may be directed by the city council and according to law."
19. That the proposed enlargement of its plant will cost approximately $125,000.
20. The resolution of 4 November, 1929, is the only official act which the board of aldermen of the city of Kinston has ever taken with reference to the $80,000 in controversy.
That there will accrue and be available for use from the operation of the electric light plant before 1 July, 1930, an amount sufficient, when added to the $80,000 already provided, to make more than the total of $125,000 needed for the proposed enlargement of the electric light plant.
21. The city of Kinston has promptly met all interest due on its bonded indebtedness and all bonds issued by it as they respectively fell due, either by the payment or refunding thereof, and there are now no bonds of the said city past due and unpaid, and no past due and unpaid interest coupons.
22. That the city had in hand, all told, money including certificates of deposit as of 31 January, 1930, date of last trial balance, $297,472.53.
23. That the amount of the bonded indebtedness of the city of Kinston as of 31 May, 1929, was $784,000, on which there has been paid since said date and prior to the institution of this action, the sum of $20,000, leaving the total bonded indebtedness of the said city as of the date of the institution of this action, $764,000.
24. That the question of the purchase and installation of said new electrical unit and equipment, for the enlargement and improvement of its plant, and the question of the expenditure to be made therefor, has not been submitted to the vote of the qualified voters at an election to be held exclusively for that purpose; nor does the defendant city propose to submit the question of purchase and installation of the same to the voters of the defendant city; nor has any referendum been requested or in any way asked.
25. For some years past, the city of Kinston has been furnishing and selling electric current to the residents of the suburbs, much beyond the corporate limits and has furnished street lighting in said suburbs. The city has furnished the wiring to the various residents and street lights, and charges and receives from such suburban residents the same rate as is paid by the resident of the city.
26. The city of Kinston has entered into contracts with and supplies the town of Snow Hill, in Greene County, the town of Grifton, in Pitt County, and the town of Pink Hill, in Lenoir County, by which, in general, the lines owned by the said towns or by other parties are carried to the plant of the city of Kinston, and connected with the *Page 79 
switchboard and electric current is sold to the said towns and measured by meters at the switchboards. These towns or other persons in turn retail the current to the consumers and pay the city of Kinston at contract prices.
27. Under contract, the city of Kinston also furnishes electric current to the Kennedy Farm, owned by the Baptist Orphanage, and also to certain school buildings owned by the county of Lenoir.
28. The amount of electricity furnished to the suburban inhabitants, the towns above mentioned, the orphanage and the county, is inconsiderable compared to the amount consumed by the residents of the city of Kinston. The peak load of the plant is 1,625 kilowatts; the peak load or maximum amount furnished to outside consumers is 245 kilowatts.
If all the electricity furnished to persons outside the corporate limits of the city of Kinston was discontinued, whatever necessity has arisen for the enlargement of the plant would still exist. The furnishing of electricity outside the corporate limits of the city of Kinston has not and does not affect the necessity which may have arisen for the enlargement of the plant.
29. That the maximum supply of power to all the combined territory outside the corporate limits of the city of Kinston which is furnished by the city, is approximately 245 kilowatts, omitting power supply to a gin on one of the lines for a short season during the year.
30. That to discontinue the outside supply mentioned above would not remedy the existing objection and danger as herein set forth in this cause in the affidavits filed for the reason that the maximum load then remaining within the corporate limits would be approximately 1,380 kilowatts, which is more than double the maximum capacity of the city's plant with the 1,500 kilowatts generator or unit out of commission.
31. That on 26 February, 1930, the board of aldermen duly adopted a resolution reading as follows:
"A resolution relating to and providing for the enlargement of the electric light system and plant of the city of Kinston.
Whereas, in the judgment of the council of the city of Kinston the electric light system and plant of the city is inadequate and insufficient for the present needs of the city and its inhabitants, and does not in its present capacity and condition afford reasonable protection and safety to the life and property of the inhabitants of said city; and,
Whereas, the council of said city has heretofore given due consideration to the enlargement of said system and plant, and has taken steps to enlarge the same, and now desires to proceed with all reasonable expedition with the construction of such necessary and proper enlargement; *Page 80 
Now, therefore, be it and it is hereby ordained and resolved by the city council of the city of Kinston, that all steps taken and arrangements made heretofore by the city council and by the officers and agents of said city under the direction of its council be and the same are hereby approved.
Be it and it is hereby further ordained and resolved that the present electric light system and plant of the city of Kinston is in the judgment of the council inadequate and insufficient and does not provide reasonable safety and protection to the life and property of the inhabitants of said city.
Be it and it is hereby ordained and resolved that the officials and agents of said city proceed with arrangements and plans for the enlargement of said system and plant to such standard size and proportion as in their judgment and in the judgment of the city council may be proper, and that the expense and cost of the same be paid from any funds which may have heretofore accrued or which may hereafter accrue from the operation of the said electric light system and plant, and from the water system and plant of said city, and also which may have accrued or may hereafter accrue from any other sources available under the law for such purpose; and that all arrangements and plans for such construction proceed as may be permitted under the law."
32. The court further finds that the facts set out in the affidavits of W. B. Coleman, F. G. Godfrey, R. J. Grantham, Martin Swartz, W. J. McAdams and John E. Meyher filed in this cause are true.
From the foregoing facts, the court arrives at the following conclusions of law:
1. That the sum of $80,000 in controversy is not and never has been a part of the sinking fund of the city of Kinston.
2. That the restraining order heretofore issued herein be and the same is hereby dissolved.
From the foregoing findings of fact and conclusions of law, it is ordered that the restraining order heretofore issued be and it is hereby dissolved.
Signed this 22 March, 1930, both plaintiffs and defendants consenting that this judgment might be signed at the convenience of the presiding judge, wherever he might be."
From the foregoing judgment the plaintiff appealed.
The record presents the following questions of law:
1. Can a municipal corporation owning an electric light and power system enlarge the same and expend therefor funds derived from the operation thereof?
2. Can a municipal corporation use any part of a sinking fund created by law for the enlargement, maintenance or extension of a municipally owned light and power or water plant?
3. Can a municipal corporation furnish light and power to customers outside the city limits?
C. S., 2787, subsections 3 and 5, empower all municipal corporations "to purchase, conduct, own, lease and acquire public utilities," and "to create, provide for, construct, regulate, and maintain all things in the nature of public works," etc. Furthermore, section 15 of the charter of the city of Kinston expressly authorizes the municipality to purchase an electric light plant and "to regulate all public utilities in said city and to require an efficiency for public service." The power to purchase said utility was contingent upon submitting the question to the "qualified taxpaying voters at an election to be held exclusively for that purpose." The city acquired the plant by the method prescribed by law. It is contended, however, that said section of the city charter forbade an expenditure for the enlargement of a plant so acquired unless the question of enlargement was also submitted to a vote of the "qualified taxpaying voters," etc. In the first place, it is to be doubted whether the provision submitting the question to "qualified taxpaying voters" is a valid provision. Certainly it would seem to be an innovation to exclude from participation in public elections all those who are not taxpayers although they might be otherwise qualified to vote. However this may be, the proviso in the charter requiring the question to be submitted to popular vote, as we interpret it, refers to the initial acquisition of the property. Ordinarily the power to acquire property, nothing else appearing, would imply a corresponding power to maintain the property in such a reasonable manner as might be necessary to guarantee at all times efficiency of service and the protection of the citizens of the community.
In the case at bar it appears from the record that the board of aldermen found as a fact that the plant in its present condition was inadequate and insufficient for the present needs of the city and its inhabitants.
The trial judge also finds that the facts stated in certain specified affidavits are true. These affidavits are to the effect that the present plant must be enlarged in order to meet the reasonable needs of the city and to protect the property rights of the inhabitants thereof. *Page 82 
Under these circumstances we are of the opinion that the city has the power to enlarge the plant without submitting the question of enlargement to popular vote. The case of Robinson v. Goldsboro, 135 N.C. 382,47 S.E. 462, is not at variance with this conclusion. In that case authority was given the board of aldermen to "issue bonds from time to time" not to exceed, however, $200,000. A portion of the total was issued and thereafter the city undertook to increase the capacity of the plant without submitting the question to a vote of the people. Clearly the Legislature had prescribed the mode upon which $200,000 should be issued and the power so delegated had not been exhausted. The Court remarked: "Certainly, until this power is exhausted, it excludes any other." In the present case, so far as the record discloses, the original power was exhausted and the original mode of acquiring the light plant strictly complied with.
Assuming that the city has the power to enlarge the plant, under the circumstances disclosed in the record, it clearly appears that the funds for such enlargement are not to be derived from pledging the faith or credit of the municipality, but from the proceeds of the operation of the plant itself. The right of a city to use funds on hand for a public purpose is fully sustained by the decisions of this Court. Adams v. Durham,189 N.C. 232, 126 S.E. 611; Holmes v. Fayetteville,197 N.C. 740, 150 S.E. 624; Nash v. Monroe,198 N.C. 306.
We are therefore of the opinion that the first question of law raised by the record must be answered in the affirmative.
The second question of law rests upon the express provision of Article II, section 30, of the Constitution of North Carolina which established the inviolability of sinking funds provided for the retirement of bonds. The constitutional provision is further enforced by C. S., 2969(s), which provided in substance that any member of a board or any disbursing officer who shall knowingly vote for the diversion of a sinking fund raised by taxation shall be guilty of a felony. Therefore, the second question of law raised by the record must be answered in the negative. However, the trial judge finds as a fact that the $80,000 which the city proposes to use in enlarging the light plant was derived from profits from the operation of said plant and was placed in the sinking fund by the city clerk without authority from the board of aldermen and for his own convenience in keeping the record of municipal accounts. Therefore, it is clear that, upon the findings of fact made by the trial judge, the $80,000 was never a part of the sinking fund of the city of Kinston because a sinking fund is the creature of law and not the creature of a bookkeeper. Hence it was entirely proper for the city to make its records speak the truth and to segregate this fund from the *Page 83 
general sinking fund provided by law. It was further found that the entire cost of enlarging the plant was to be paid solely and exclusively from revenue produced by the plant, and that no part of the cost of such improvement was to be raised by taxation.
The third question of law has been answered in the affirmative in the case of Holmes v. Fayetteville, supra. Assuming, however, that the third question should be answered in the negative, the record discloses, and the judge finds as a fact that "the furnishing of electricity, outside the corporate limits of the city of Kinston, has not and does not affect the necessity which may have arisen from the enlargement of the plant." Hence, the fact that a small amount of electricity was sold outside the city limits, has no determinative bearing upon the question of law involved.
The plaintiff requests that the facts be reviewed by this Court. The Court has power to review facts in injunction proceedings. Peters v.Highway Commission, 184 N.C. 30, 113 S.E. 567. Nevertheless, there is a presumption that the judgment and findings of fact are correct and the burden is upon the appellant to assign and show error. Plott v.Commissioners, 187 N.C. 125, 126 S.E. 190.
Upon a review of the entire record, we are of the opinion that there is evidence to support the findings made by the trial judge and no error has been suggested warranting the overthrow of the presumption which said findings create.
Affirmed.