JACK RIDER, RACHEL D. DAVIS AND BRAXTON NEWMAN, RESIDENTS AND TAXPAYERS OF LENOIR COUNTY, IN THEIR OWN INTEREST AND IN THE INTEREST OF ALL OTHER RESIDENTS AND TAXPAYERS OF LENOIR COUNTY, WHO MAY MAKE THEMSELVES PARTIES TO THIS ACTION, v. LENOIR COUNTY; B. C. LANGSTON, W. L. MEASLEY, MARK N. SMITH, HARRY SUTTON AND IKE WHITFIELD, CONSTITUTING THE BOARD OF COUNTY COMMISSIONERS OF LENOIR COUNTY, THE LAST NAMED BEING CHAIRMAN OF SAID BOARD OF COUNTY COMMISSIONERS.

(Filed 6 January, 1953.)

1. **Elections §§ 6½, 28—**

    A primary election is merely a mode of choosing candidates of political parties, while a regular election is the final choice of the electorate. G.S. 163-117, *et seq.*

2. **Elections § 9a: Taxation § 4—**

    A party primary is not an election within the purview of G.S. 153-93 proscribing the holding of a special bond election within one month of a regular election for county officers.

**3. Same: Hospitals § 6½—**

Ballot for a bond election for a county hospital stating that the proposed bond issue is to finance the erection of additions to and alterations and reconstruction of existing buildings comprising a named hospital implies the acceptance of the named hospital by the county from its private corporate owner in accordance with the plan theretofore repeatedly discussed in the public press, and the ballot is not objectionable for duplicity on this ground.

**4. Taxation § 38a—**

Action to enjoin issuance of hospital bonds and to restrain disbursement of county funds therefor on the ground of those irregularities in the bond order and form of ballot asserted in this case *held* precluded by G.S. 153-90 or G.S. 153-100 because not instituted until after thirty days subsequent to the statement of the result of such election.

**5. Hospitals § 6½ : Taxation §§ 4, 38a—Where bond order stipulates total sum to be expended, appropriation of large additional sum is unauthorized.**

While a county may ordinarily expend unallocated nontax moneys for the public purpose of a county hospital even in those instances in which a bond order for the hospital does not specify that the proceeds of the bonds are to be used together with such unallocated nontax moneys, *held* where the bond order specifically specifies that the total maximum amount to be expended by the county for the hospital is not to exceed $465,000 the allocation of an additional supplemental appropriation of over $138,000 out of nontax moneys on hand is a material variance from the compact as set forth in the bond order, and the county should be restrained in a proper suit from issuing the bonds and disbursing county funds in accordance with hospital plans predicated upon such increased appropriation.

**6. Same: Equity § 3—**

Suit to restrain a county from issuing hospital bonds and from disbursing county funds in accordance with a plan for the enlargement and improvement of a county hospital on the ground of the inclusion in the plan for expenditures a sum greatly in excess of that approved in the bond election for the hospital *held* not barred by laches when instituted less than two months after the county's attempt to make the supplemental appropriation and less than one month after the county had let the contract for construction.

PARKER, J., took no part in the consideration or decision of this case.

APPEAL by plaintiffs from *Burney, J.,* holding the courts of the Sixth Judicial District, at Chambers in Clinton, 11 September, 1952, from LENOIR.

Suit in equity by plaintiffs as taxpayers, against the defendants, members of the Board of County Commissioners of Lenoir County, and Lenoir County, to enjoin the issuance of hospital bonds and to restrain the disbursement of county funds and the performance of other acts proposed by the defendants in furtherance of the enlargement of a public hospital

located in the City of Kinston, heard below on return of the show-cause order and on motion of the defendants to vacate the temporary restraining order previously issued on *ex parte* application.

The hospital around which this controversy revolves was opened in 1929 by Eastern Carolina Hospital Corporation and, until conveyed to Lenoir County by deed of gift shortly prior to the commencement of this suit, it was operated by the parent corporation as a nonprofit hospital under the name of Memorial General Hospital. It was originally a 25-bed hospital, but by two enlargements it has been increased to present capacity of 69 beds, with nurses' home. The hospital and nurses' home are located on a 1.7 acre site on the east side of College Street between Rhodes and Warren Avenues in a built up residential section of Kinston.

In April, 1948, almost two years prior to the bond election here under attack, a special bond election was held in Lenoir County, in which there was submitted the question whether the voters should approve or disapprove the issuance of bonds in the amount of $950,000 for the purpose of building a public hospital on "a suitable, spacious, and adequate site to be chosen," the proceeds of which bonds, if approved and issued, were to be supplemented by State and Federal funds of approximately $1,000,-000. In the election 2,109 votes were cast for the bond issue, with 687 votes being cast *contra*. However, at the time this election was held the then existing law provided that the vote should be against the registration, and inasmuch as there were 5,420 registered voters in Lenoir County, the election failed.

Thereafter and prior to the commencement of this suit, these events transpired in furtherance of a plan by which it was proposed that Memorial General Hospital be donated to Lenoir County and that, with the aid of State and Federal funds, the hospital be enlarged on its present site to 125-bed capacity:

1. On 6 September, 1949, the Board of Trustees of Eastern Carolina Hospital Corporation adopted a resolution offering to donate to Lenoir County its hospital, including land, buildings, and all other assets, amounting in value to about $300,000, provided the County maintain and operate the hospital as a public hospital. However, the resolution also stipulates that "in any expansion program for providing adequate hospital facilities for the people of Lenoir County according to their future needs the Board of Commissioners of Lenoir County may in their sound judgment and discretion abandon the present site and plant for hospital purposes, and construct an entirely new plant and facilities, and may utilize said present plant and facilities for any other needed county purposes or otherwise dispose of said properties as county property, as in their judgment may be deemed advisable and as provided by law; . . ."

2. On 7 November, 1949, the Board of County Commissioners adopted a resolution accepting the offer of the hospital corporation, subject· to approval by a majority of the qualified voters of the county, to be expressed in a special bond election on the questions of approval by the voters of (1) the issuance of bonds to raise funds for the expansion, improvement, and modernization of the hospital facilities, (2) the levy of a tax to pay the bonds and interest thereon, and (3) the levy of a tax for the operation and maintenance of the hospital.

3. After the hospital corporation offered to donate the hospital property to Lenoir County, a proposed bond order was introduced at the regular meeting of the Board of Commissioners held on 1 May, 1950. This bond order proposed the issuance of $465,000 public hospital bonds, subject to approval by the voters of the county at a special election to be held for that purpose.

The bond order contains these pertinent recitals and stipulations:

"WHEREAS, the Board of Commissioners of the County of Lenoir deems it advisable that the County shall establish, operate and maintain a public hospital for the use of the inhabitants of said County and the Eastern Carolina Hospital Corporation has offered to convey to the County the existing hospital and hospital facilities known as the Memorial General Hospital now maintained by said corporation in the City of Kinston, provided the County will operate and maintain such existing hospital and hospital facilities as a public county hospital, and the Board of Commissioners desires to accept the conveyance of such existing hospital and hospital facilities and to expand and improve such existing hospital and hospital facilities:  Now THEREFORE,

"BE IT ORDERED by the Board of Commissioners of the County of Lenoir as follows:

"Section 1.  The Board of Commissioners of the County of Lenoir has ascertained and hereby determines that, in order to provide adequate hospital facilities for the inhabitants of said County, it will be necessary to expand and enlarge the existing hospital facilities comprising such Memorial General Hospital, and that it will be necessary to expend for such purpose *not to exceed $465,000 in addition to any funds which may be contributed by the Federal Government or any of its agencies or by other persons or associations."*  (Italics added.)

The bond order was published in the 15 May, 1950, issue of the *Kinston Free Press,* a newspaper of general circulation, published and circulated in Lenoir County, together with notice of a public hearing to be held 5 June, 1950, on the question of the final adoption of the order, and. on that date the bond order was unanimously adopted and approved by the Board of Commissioners "without change or amendment." (G.S. 153-78.)

4. On 5 June, 1950, the Board of Commissioners also adopted a resolution reciting the previous adoption of the bond order and calling a special election for 8 July, 1950, "for the purpose of submitting to the qualified voters of said county, for their approval or disapproval, (1) the bond order . . . and . . . the indebtedness to be incurred by the issuance of the bonds authorized by such bond order, and (2) the levy annually of a special tax of not exceeding ten cents on each $100 of assessed valuation of taxable property to finance the operation, equipment and maintenance of the public hospital described in said bond order." Notice of the special election so called was published in the *Kinston Free Press* in the issues of 6, 13 and 20 June, 1950. Also, the full text of the bond order was published again in the 13 and 20 June, 1950, issues of the *Kinston Free Press*. And in addition to this, "numerous editorials, news stories, articles, and advertisements relating to the question of whether said bond order should be approved or disapproved by the voters appeared in said newspaper subsequent to May 1, 1950 and prior to July 8, 1950."

5. The form of the ballot as prescribed by the resolution calling the special election and as used in the election submitted these two propositions:

"PROPOSITION No. 1. Shall the qualified voters of the County of Lenoir approve the bond order adopted by the Board of Commissioners of said County on the 5th day of June 1950, authorizing (1) the issuance of bonds of said County of the maximum aggregate principal amount of $465,000 to finance the erection of additions to and the alteration and reconstruction of the existing buildings comprising the Memorial General Hospital and the erection of an additional building or buildings for such hospital, including a nurses' home and health center, and the acquisition and installation of equipment required for such buildings, and the acquisition of any lands necessary for a site for such buildings, and (2) the levy of an annual tax sufficient to pay the principal of and interest on the bonds; and shall the qualified voters approve the indebtedness proposed to be incurred by the issuance of such bonds?"

"PROPOSITION No. 2. Shall the qualified voters of the County of Lenoir approve the levy of a special tax of not exceeding ten cents, annually, upon each $100 of assessed valuation of taxable property in said County to finance the cost of operating, equipping and maintaining a public hospital for the use of the inhabitants of said County?"

6. At the election held 8 July, 1950, the bond order and proposals to levy a tax to service the bonds were approved by a majority of the voters voting, as determined by statement of the official canvass of the returns made 31 July, 1950, duly published 2 August, 1950, the vote being 2,371 for the bond issue and related questions, and 1,324 *contra*. Proposition No. 2 also carried by a vote of 2,182 to 1,380 *contra*. (The total registration was 12,765.)

7. It is here noted that prior to the 8 July, 1950, election the law was amended so as to provide that future elections of this kind should be determined by a majority of the votes actually cast, rather than by vote against the total registration. (Chapter 497, Sections 2 and 8, Session Laws of 1949, ratified 22 March, 1949, now codified as G.S. 153-92 as amended and G.S. 153-92.1.)

8. On 19 December, 1950, the Board of County Commissioners adopted a resolution accepting the hospital and the deed conveying the property to the County. And at the same meeting a resolution was adopted appointing a Hospital Building Committee, composed of five citizens, who were authorized to employ architects and work out plans and specifications for the expansion and improvement of the donated hospital property, and this was done.

9. On 21 February, 1952, the plans and specifications, as approved by the Building Committee, were submitted to and approved by the Board of Commissioners. Thereafter approval was given by the North Carolina Medical Care Commission and the Federal Security Agency, U. S. Public Health Service, the North Carolina State Board of Health, and the City of Kinston building inspector.

10. On 27 March, 1952, bids for construction of the hospital property were received and publicly opened.

11. On 2 April, 1952, the Hospital Building Committee reported to the Board of County Commissioners (1) that in accordance with the lowest and best bids received the total cost of the project was $1,190,750; (2) that State and Federal funds allocated, together with the proceeds of the approved bond issue of $465,000, amounted to $1,052,036.20; and (3) that an additional $138,713.80 would be required to accept the bids. The committee recommended that acceptance of the selected low bids be approved and requested the additional appropriation of the necessary $138,713.80.

12. And on 2 April, 1952, the Board of County Commissioners attempted to comply with the recommendation of the hospital building committee, and entered a resolution appropriating for the purpose of paying the rest of the total cost of "planning, construction, remodeling, additions to and equipment of" the hospital the sum of $138,713.80 from "funds of Lenoir County on hand and available," theretofore unallocated and unappropriated. The court below found that these funds were derived from "profits on the operation of alcoholic beverage control stores within Lenoir County," and therefore from sources other than taxation.

13. On 25 April, 1952, contracts for construction were entered into in accord with bids accepted, and work was scheduled to begin on 19 May, 1952.

14. On 29 April, 1952, public hospital bonds in the amount of $465,000 were sold by the County.

The plaintiffs instituted this suit 15 May, 1952. In their complaint, consisting of eight separate causes of action, the plaintiffs set up numerous alleged irregularities and illegalities in the bond order, the bond election, and the acts and conduct of the defendants in connection with the hospital project.

On 17 May, 1952, a temporary restraining order was served on the defendants, enjoining the delivery of the bonds authorized at the bond election, and restraining the expenditure of any part of the proceeds of the bond moneys or of the supplemental appropriation of $138,713.80 for the proposed hospital project. The defendants filed answer denying the material allegations of the complaint, and alleging that the plaintiffs are not entitled to maintain any of their causes of action by reason of laches resulting from unreasonable delay and lack of diligence on their part.

When the cause came on for hearing below on return of the show-cause order and motion of the defendants to vacate the temporary restraining order, numerous affidavits were offered in evidence by both sides. At the conclusion of the hearing and after arguments of counsel, Judge Burney by consent took the case under advisement and later found facts, made conclusions of law, and entered judgment. The conclusions reached and the adjudications made by the judgment are adverse to the plaintiffs' contentions, and sustain all the defendants' material allegations, including their pleas of laches. The temporary restraining order was vacated and dissolved.

From the judgment so entered the plaintiffs excepted and appealed, assigning errors.

*R. S. Langley, Matt H. Allen, and John G. Dawson for plaintiffs, appellants.*

*Chas. B. Aycock, R. A. Whitaker, and Thos. J. White for defendants, appellees.*

*Reed, Hoyt & Washburn of counsel for defendants, appellees.*

JOHNSON, J. This appeal comes here on a printed record of 499 pages. The complaint covers 93 pages and the judgment 57. More than 30 assignments of error have been brought forward and argued in the briefs. All these have been duly considered and the entire record has been carefully examined. But necessarily we include in this opinion and the preliminary statement of facts only such references to the record as seem pertinent to decision. *S. v. Smith,* 221 N.C. 400, 20 S.E. 2d 360; *S. v. Lea,* 203 N.C. 13, 164 S.E. 737.

The questions raised by the appeal fall into two classes: (1) those which relate to the validity of the bond order and bond election, and (2) those which challenge the legality of the proposed expenditures on the

ground that they are materially in excess of the amount approved and limited by vote of the people.

1. *Questions relating to the validity of the bond order and the bond election.*—The plaintiffs point to numerous alleged irregularities in both the bond order adopted by the Board of Commissioners and in the conduct of the election as held on 8 July, 1950. However, chief stress seems to be placed on the contention that the bond election, having been held within one month after the regular Democratic run-off primary election of 24 June, 1950, was held in violation of the provisions of this statute:

"G.S. 153-93. When election held.—Whenever the taking effect of an order authorizing the issuance of bonds is dependent upon the approval of the order by the voters of a county, the governing body may submit the order to the voters at an election to be held not more than one year after the passage of the order. The governing body may call a special election for that purpose, or may submit the order to the voters at the regular election for county officers next succeeding the passage of the order, *but no such special election shall be held within one month before or after a regular election for county officers.* Several orders or other matters may be voted upon at the same election. (1927, c. 81, s. 23)" (Italics added.)

The court below found, on uncontroverted evidence: "That one of the days on which the registration books were opened for the registration of voters in said special election to be held July 8, 1952, was Saturday, June 24, 1950. That on Saturday, June 24, 1950, there was held in Lenoir County and throughout the State of North Carolina, a primary election which was a 'second primary' or 'run-off' primary for the nomination of the Democratic candidate for the U. S. Senate, and in Lenoir County on said date, there was a second primary or run-off primary election for the nomination of the Democratic candidate for Sheriff of Lenoir County; that in Trent Township in Lenoir County on said date, there was a second primary or run-off primary for the nomination of the Democratic candidate for Constable in said township. That the last regular election for the election of County officers held in Lenoir County prior to said special election held on July 8, 1950, was held November 2, 1948. That the next regular election for County officers held in Lenoir County subsequent to said special election held July 8, 1950, was held November 7, 1950."

The defendants insist (1) that the Democratic run-off primary held 24 June, 1950, was not a "regular election for county officers" in contemplation of G.S. 153-93, and that this statute does not apply here; but (2) if it be held otherwise, then, in any event, the defendants insist that since the plaintiffs did not institute this suit within the 30-day limitation period prescribed by G.S. 153-100, the plaintiffs are precluded from attacking the bond election by the express terms of this latter statute.

As to this, the plaintiffs contend in effect that the 24 June, 1950, Democratic run-off primary was a "regular election for county officers," within the meaning of G.S. 153-93, and that the 8 July, 1950, bond election, held less than 30 days after the primary election, was held in violation of this statute, and that by reason thereof the bond election was utterly void and subject to attack at any time, irrespective of the 30-day limitation provisions of G.S. 153-100, upon the theory that in legal contemplation no bond election was held, and that the limitations imposed by G.S. 153-100 apply only to irregular or voidable elections, as distinguished from those which are utterly void.  See *Monroe v. Niven,* 221 N.C. 362, 20 S.E. 2d 311.

An examination of G.S. 153-93 in the light of these contentions *pro* and *con* discloses that when a bond election is required to be held, as in the instant case, the statute by express terms provides that "The governing body may call a special election . . ., or may submit the order to the voters at the regular election for county officers next succeeding the passage of the order, . . ." It thus appears that this statute does not declare as a matter of fixed legislative policy that a bond election must be held more than a month before or after any other election, on a day specially set apart for such election.  Indeed, the statute leaves it for the Board of Commissioners to say whether in their discretion the bond proposition shall be submitted at a special election called for that purpose, or passed on by the voters at the "regular election for county officers next succeeding the passage of the (bond) order, . . ." It is only when the Board of Commissioners decide to call a special election that the statute inhibits holding the special election within one month "before or after a regular election for county officers."

Moreover, since the express language of the statute provides that in the discretion of the Commissioners the bond order may be submitted to the voters "at a regular election for county officers," it is manifest that the "regular election" contemplated is the regular election at which county officers are actually elected, as distinguished from a primary election held merely for the purpose of nominating candidates later to be voted on.  See Constitution of North Carolina, Article VII, Section 1; Article II, Section 27; and Article IV, Sections 24 and 25; G.S. 163-4.

And if this be the legislative meaning of "regular election for county officers" when used first in the statute in conferring on the Board of Commissioners discretionary power either to call a special election or to submit the proposed proposition at a "regular election for county officers," then it would seem reasonable to infer that the Legislature placed the same meaning on the expression "regular election" when used the second time in the same statute in directing that when a special election is called it shall not be held within one month before or after a "regular election

for county officers." *Expressum facit cessare tactitum;* 50 Am. Jur., Statutes, Sections 243 and 247.

A contextual study of this statute leaves the impression that the Legislature did not intend to include within the inhibitions of the statute a party primary.

All the more would this seem to be so since there is a well-defined distinction between a primary election and a regular election. A primary election is a means provided by law whereby members of a political party select by ballot candidates or nominees for office; whereas a regular election is a means whereby officers are elected and public offices are filled according to established rules of law. In short, a primary election is merely a mode of choosing candidates of political parties, whereas a regular election is the final choice of the entire electorate. G.S. 163-117 to 147; 29 C.J.S., Elections, Section 1 (d) and (e); Words and Phrases, Permanent Edition, Vol. 36, p. 667 *et seq.*

It is also significant that at the time of the enactment of G.S. 153-93 in 1927 our Primary Law had been on the statute books about 12 years. (Chap. 101, Public Laws of 1915, now codified as G.S. 163-117 *et seq.*) Thus, the absence from the language of the statute at hand of any reference to primary elections negatives the idea that such an election was intended by the Legislature to be included in the term "regular election for county officers."

It is also relevant to note in this connection that Chapter 1084, Section i (f), now codified as 18-124 (f), which provides that no special election under the Wine and Beer Control Act shall be held within 60 days of certain designated elections, expressly names and places within the inhibited class these elections: "any general election, special election, or primary election in said county or any municipality thereof." See also G.S. 18-61.

We conclude that the term "regular election for county officers," as used in G.S. 153-93 does not include a party primary.

In this view of the case, we do not reach for decision the question whether a special bond election held within one month before or after a "regular election for county officers" amounts to such violation of G.S. 153-93 as to render the election wholly void and subject to attack at any time on the theory that no election was held, or merely voidable and subject to attack only within the 30-day period provided by the limitations imposed by G.S. 153-100.

The plaintiffs further contend (1) that the bond order as adopted by the Board of Commissioners is violative of G.S. 153-78 and invalid for duplicity in stating the purpose for which the bonds are or may be issued; (2) that the form of the ballot by which the question of the bond issue was submitted is likewise bad for duplicity; and (3) that the form of the

ballot was vague and did not present to the voters the question of acceptance of the offer of the hospital corporation to donate the hospital to the County. These and other alleged irregularities of the same type, challenging the validity of the bond order and bond election, we deem it unnecessary to discuss in detail. Suffice it to say, we think the ballot was sufficient in form to present the question of acceptance of the offer to donate the hospital. Proposition No. 1 set out on the ballot states that the purpose of the proposed bond issue "is to finance the erection of additions to and the alteration and reconstruction of the existing buildings comprising the Memorial General Hospital and the erection of an additional building or buildings for such hospital . . .," as authorized by the bond order of 5 June, 1950. We think it clearly implicit in this language that the County was to accept and take title to the hospital in the event of a favorable vote on the proposed bond issue.

As to the rest of the alleged irregularities, it is manifest that the plaintiffs, not having commenced this suit within 30 days after publication of the statement of results of the bond election, are now precluded from asserting any right of action based thereon by virtue of the provisions of one or the other of these statutes:

"G.S. 153-90. Limitation of action to set aside order.—Any action or proceeding in any court to set aside a bond order, or to obtain any other relief, upon the ground that the order is invalid, must be commenced within thirty days after the first publication of the notice aforesaid and the order or supposed order referred to in the notice. After the expiration of such period of limitations, no right of action or defense upon the validity of the order shall be asserted, nor shall the validity of the order be open to question in any court upon any ground whatever, except in an action or proceeding commenced within such period. (1927, c. 81, s. 20)."

"G.S. 153-100. Limitation as to actions upon elections.—No right of action or defense founded upon the invalidity of the election shall be asserted, nor shall the validity of the election be open to question in any court upon any ground whatever, except in an action or proceeding commenced within thirty days after the publication of such statement of result as provided in Sec. 153-99. (1927, c. 81, s. 30.)"

We conclude that as to both the bond order and the bond election no irregularity now open to challenge has been made to appear. It follows, then, that the court below correctly held that the bond election is in all respects valid.

2. *The question of limitation on the amount to be expended on the hospital project.* Here the plaintiffs, treating the bond election as valid, challenge the legality of the supplemental appropriation of $138,713.80 from surplus nontax funds on the ground that this additional appropriation materially varies the terms of the bond order and the proposition submitted to and approved by the voters.

It may be conceded that the enlargement of a county hospital is a public purpose for which a county ordinarily may expend unallocated nontax moneys on hand without vote of the people. G.S. 131-126.23; *Adams v. City of Durham,* 189 N.C. 232, 126 S.E. 611; *Nash v. City of Monroe,* 198 N.C. 306, 151 S.E. 634; *Mewborn v. City of Kinston,* 199 N.C. 72, 154 S.E. 76; *Burleson v. Board of Aldermen of Town of Spruce Pine,* 200 N.C. 30, 156 S.E. 241.

And it may be conceded also that where such public funds are to supplement bond moneys, it is not required that the bond order specify, or the voters be advised, that the proceeds of the proposed bond issue are to be used with, or in addition to, a sum of money on hand or otherwise available for the proposed improvement. G.S. 153-78. See also *Atkins v. McAden,* 229 N.C. 752, 51 S.E. 2d 484.

However, under the statutory procedure prescribed for submitting a bond proposal to the voters, as in the instant case, the bond order, required to be adopted by the Board of Commissioners and published prior to the election, is the crucial foundation document which supports and explains the proposal to be submitted. (G.S. 153-78, 86, 87, 89), and material representations set out in the bond order ordinarily become essential elements of the proposition submitted to the voters.

Accordingly, where the bond order contains a stipulation definitely fixing the maximum amount of county funds to be expended on a proposed project, such stipulation, treated as a compact, becomes a limitation upon subsequent official acts based on a favorable vote and may not be materially varied. 64 C.J.S., Municipal Corporations, Sec. 1865, p. 408; *Moore v. Central City,* 118 Neb. 326, 224 N.W. 690; *Raff v. Philadelphia,* 256 Pa. 312, 100 A. 815. See also *Waldrop v. Hodges,* 230 N.C. 370, 53 S.E. 2d 263; *Teer v. Jordan,* 232 N.C. 48, 59 S.E. 2d 359; Anno.: 117 A.L.R. 892, 895.

In the case at hand it is noted that the bond order stipulated in effect that the proposed hospital project will require "not to exceed $465,000" of county funds. It now turns out that the amount so limited is not enough to complete the project according to present plans, and in order that the contracts for construction may be let, it appears necessary for the County to appropriate an additional sum of $138,713.80.

A study of this record impels the conclusion that the proposed supplemental appropriation of $138,713.80 of county funds works a material variance of the proposition submitted to and approved by vote of the people in the 8 July, 1950, election, and is therefore invalid. It necessarily follows that since the total county funds now proposed to be spent on the hospital project is materially in excess of the maximum amount authorized by vote of the people, the defendants are without authority of

law to disburse the funds here involved or proceed further with the hospital project pending further proceedings below. (See G.S. 159-49.1.)

As to this phase of the case, the lower court's conclusion that the plaintiffs are not entitled to relief because of laches is without adequate factual support. The facts found below disclose that the Board of Commissioners did not attempt to make the proposed supplemental appropriation until 2 April, 1952, nor attempt to let the contract for construction until 25 April, 1952. This suit was instituted 15 May, 1952. These findings do not support the conclusion that the plaintiffs are barred by laches.

For the errors indicated, the judgment below is reversed and the cause remanded for entry of judgment and further proceedings below in conformity with this opinion, and the defendants, if so advised, may (1) consider the feasibility of conforming the proposed project to the limits authorized by the voters, or (2) submit another or other proposals to the voters. Meanwhile, the temporary restraining order will be deemed and treated as in force and effect to the extent of staying disbursement of funds in furtherance of the proposed hospital enlargement project and preventing further action on the part of the defendants in furtherance of the construction project, except in conformity with this opinion.

Error and remanded.

PARKER, J., took no part in the consideration or decision of this case.