H. L. PERKINS, J. W. PERKINS AND N. C. NEWMAN, PARTNERS, V.
B. L. LANGDON.

(Filed 25 February, 1953.)

**1. Landlord and Tenant § 16½—**

In the absence of a covenant to the contrary, the landlord generally has the right to sell the premises subject to the lease without incurring liability to the tenant, since ordinarily the sale neither terminates the leasehold estate nor deprives the tenant of any of his rights.

**2. Same: Frauds, Statute of, § 11: Registration § 5c—**

Where the landlord transfers the premises to an innocent purchaser for value without notice, actual or constructive, of a parol lease for a three year term, the grantee takes the unencumbered fee, and the destruction of the leasehold estate by the transfer is a wrong to the lessee entitling lessee to recover of the lessor the resulting damages without averring demand upon the grantee for possession and his refusal. G.S. 22-2, G.S. 47-18.

**3. Landlord and Tenant § 16½ : Frauds, Statute of, § 11—**

Testimony of lessees to the effect that lessor leased the premises by parol for a term of three years and covenanted not to sell same during the period of the lease, together with lessor's admission that he sold the premises at the end of the first year, *is held* sufficient to establish a *prima facie* case in favor of lessees, and lessor's motion to nonsuit was properly denied, notwithstanding that part of the testimony of one of lessees may be susceptible to the conflicting inference that the lease was for three years with privilege of renewal so as to make the contract invalid under the statute of frauds. G.S. 22-2.

**4. Trial § 22c—**

Inconsistencies or contradictions, even in plaintiff's evidence, do not justify nonsuit, since it is for the jury and not the court to resolve such conflict.

**5. Landlord and Tenant § 16½—**

In the lessee's action for wrongful termination of his parol lease as a result of the sale of the premises by the landlord to a purchaser for value without notice, plaintiff lessee has the burden of proving that the purchaser did in fact take title without actual or constructive notice of the lease.

**6. Notice § 2—**

While ordinarily a party who has information which is reasonably calculated to put him upon inquiry is charged with constructive notice of all that a reasonable inquiry would have disclosed, the rule of constructive notice does not apply if the matters of which he has notice are not reasonably sufficient to excite inquiry, or are insufficient to impose upon him the duty to make such inquiry.

**7. Same: Landlord and Tenant § 16½—Question of purchaser's constructive notice of lease held for jury upon the evidence in this case.**

Plaintiff lessees instituted this action to recover damages resulting from the alleged wrongful termination of their three year parol lease by lessor's conveyance of the property at the end of the first year to an innocent purchaser for value without notice. Plaintiffs' evidence tended to show that under the lease they were to be in possession of the property only a part of each year, and that at the time of the sale lessees were not in possession. One of the purchasers testified that he knew plaintiffs had a three year lease but that defendant lessor told him that the contract of lease permitted him to sell after one year. Plaintiffs also offered in evidence allegation of lessor's answer admitting that the purchaser had no notice. *Held:* Whether the purchaser with notice of the lease was under duty to make inquiry in the face of lessor's positive statement that the lease contract permitted him to sell after one year is a question for the jury, and upon all the evidence the question of the purchasers' constructive notice of the lease was properly submitted to the jury and lessor's motion for peremptory instructions thereon in his favor was properly overruled.

**8. Contracts § 25a—**

The measure of damages for breach of contract is the amount which would have been received if the contract had been performed as made, including loss of prospective profits when such loss is the natural and proximate result of the breach, may be ascertained with reasonable certainty, and be such as may reasonably be supposed to have been within the contemplation of the parties when the contract was executed. Plaintiff must allege and prove such special damage.

**9. Same: Landlord and Tenant § 16½: Damages §§ 1c, 11—Competency of evidence to show loss of prospective profits resulting from breach of lease contract.**

Plaintiffs instituted this action to recover for breach of a parol lease of tobacco warehouses for a period of three years upon allegations that de-

fendant lessor sold the property at the expiration of the first year to a *bona fide* purchaser for value without notice, actual or constructive. The allegations of the complaint laid proper predicate for the recovery of loss of prospective profits as special damages. Evidence of plaintiffs' promotional work during the first year causing a nonrecurring expense, but resulting in the major tobacco companies sending buyers to the market and the acquisition of government graders, together with evidence of profits made the year before and the first year of the operation of the warehouses by plaintiffs, as well as testimony of statements by lessor tending to show he expected increased business, and opinion evidence of witnesses, based upon operations at the market during the second two years and their experience in the business, as to the value of the lease for the second two years, *is held* competent on the issue of special damages.

**10. Evidence § 46d—**

The value of the use of property may be proved by the opinion evidence of witnesses acquainted with the property and the facts bearing upon its use.

**11. Evidence § 52—**

Form of hypothetical question to expert witnesses in this case *held* in substantial compliance with approved rules governing the reception of such evidence.

**12. Appeal and Error § 38—**

Appellant has the burden not only of showing error but also that the alleged error was material and prejudicial, since verdicts and judgments are not to be set aside for mere error and no more.

**13. Damages § 13a—**

The court's charge on the issue of damages *held* without error in this case.

APPEAL by defendant from *Carr, J.,* and a jury, at May Civil Term, 1952, of ALAMANCE.

Civil action to recover damages for alleged breach of rental contract.

The defendant, being the owner of two leaf tobacco sales warehouses located in the City of Fayetteville, entered into a rental contract with the plaintiffs whereby the defendant leased the warehouses and their equipment to the plaintiffs for the three marketing seasons of 1947, 1948, and 1949. The contract rests in parol. There is no controversy respecting its general terms: The plaintiffs were to finance operation of the warehouses and pay the defendant 30% of all gross commissions derived from producer sales of tobacco (these commissions being 2½% of sales), plus 30% of the tobacco basket rentals. The plaintiffs were to have possession two weeks before the opening of each tobacco selling season and surrender possession one week after the close of each season.

The plaintiffs entered into possession of the warehouses and equipment in the summer of 1947 and fulfilled the obligations imposed upon them

by the contract for the marketing season of 1947, including the payment to the defendant of all rentals due him for that season.

After the close of the 1947 marketing season, while plaintiffs were out of possession, the defendant, by deed dated 14 January, 1948, sold the warehouses and equipment covered by the rental contract to third parties, and by letter dated that day notified the plaintiffs of such sale. The purchasers took immediate possession of the warehouse property.

Thereupon the plaintiffs instituted this action, alleging in their original complaint that the defendant in selling and disposing of the warehouses at the end of the first marketing season breached the rental contract and wrongfully deprived the plaintiffs of the use and occupancy of the property for the remaining two years of the term.

The case was first tried at the May Term, 1949, of the Superior Court of Alamance. From a verdict and judgment in favor of the plaintiffs the defendant appealed, and in this Court demurred *ore tenus* to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. By decision reported in 231 N.C. 386, 57 S.E. 2d 402, the demurrer was sustained and the cause was remanded to the Superior Court. Thereafter the plaintiffs, under leave of court, on 4 March, 1950, filed an amended complaint by which the plaintiffs amplified their allegations to include, among other things, these additional averments: (1) that the defendant agreed as a part of the rental contract that he would retain ownership of the leased property "and not sell same" during the three-year term of the lease; and (2) that the defendant violated the terms of his contract by selling the property on 14 January, 1947, to R. H. Barber (Barbour) and P. L. Campbell and their spouses, who purchased "for value, in good faith, and without notice" of the rental contract.

Thereupon, the defendant moved to strike portions of the amended complaint, and from an order denying the motion the defendant again appealed to this Court. Decision modifying and affirming the court below is reported in 233 N.C. 240, 63 S.E. 2d 565. However, it is noted that there was no modification of the plaintiffs' crucial averments to the effect that (1) the defendant covenanted not to sell the leased property during the term, and (2) that the purchasers of the property took title as *bona fide* purchasers for value and without notice of the lease.

On retrial below issues were submitted to and answered by the jury as follows:

"1. Did the plaintiffs and the defendant enter into an oral contract by the terms of which it was agreed that plaintiffs would rent the defendant's two warehouses for the three tobacco marketing seasons of 1947, 1948 and 1949, as alleged in the original complaint? Answer: YES.

"2. If so, did the defendant agree to retain the ownership of said warehouses and not sell the same for said term of three years, as alleged in the amended complaint filed March 4, 1950 ? Answer : YES.

"3. Did the purchasers of the warehouses from the defendant purchase in good faith for value and without notice of the contract of rental with the plaintiffs for the said term of three years as said contract was described in the original complaint? Answer : YES.

"4. Did the purchasers of the warehouses from the defendant purchase in good faith for value and without notice of a contract of rental with the plaintiffs for the said term of three years as said contract was described in the amended complaint filed March 4, 1950? Answer : YES.

"5. Did the defendant breach the contract, as alleged by the plaintiffs? Answer : YES.

"6. What amount of damages, if any, are plaintiffs entitled to recover of the defendant? Answer : $48,100.00."

From judgment entered upon the verdict, the defendant appealed, assigning errors.

*Brooks, McLendon, Brim & Holderness and James R. Nance for plaintiffs, appellees.*

*Robert H. Dye, Cooper & Cooper, and Sanders & Holt for defendant, appellant.*

JOHNSON, J. The case comes here on a record of some 350 pages, embracing 221 exceptions, most of which are brought forward and argued *pro* and *con* in the briefs which total 96 pages. All exceptions brought forward have been duly considered, and the entire record has been carefully studied and fully examined. However, the vital issues around which the controversy revolved in the court below seem to be: (1) whether the defendant agreed not to sell the leased property during the term, (2) whether the purchasers took title charged with notice of the lease or as *bona fide* purchasers for value without notice of the lease, and (3) the issue of damages. Accordingly, we limit discussion to such of the defendant's exceptions as seem to bear materially on these factors. The exceptions not discussed are overruled. See *S. v. Lea,* 203 N.C. 13, 164 S.E. 737; *S. v. Lea,* 203 N.C. 35, 164 S.E. 737; *Rider v. Lenoir County,* 236 N.C. 620, 73 S.E. 2d 913.

When the case was called for trial, the defendant, prior to the introduction of any evidence, moved for judgment on the pleadings. The motion was denied. The defendant's exception then noted is brought forward.

Here the defendant makes the contention that a parol lease for not more than three years (not being within the provisions of the Statute of

Frauds, G.S. 22-2, or our recording laws, G.S. 47-18), is valid in law and enforceable against a *bona fide* purchaser for value without notice of the lease. On this premise, the defendant urges that it was incumbent on the plaintiffs to make demand on the new owners of the property for possession of the warehouses. As to this, the defendant asserts that the plaintiffs' failure to allege such demand (and refusal) constitutes a fatal defect in pleading which entitles the defendant to judgment on the pleadings.

It may be conceded that ordinarily the owner of leased property may sell it during the term of a lease, and in the absence of a covenant to the contrary the lessee cannot prevent the landlord from selling the premises subject to the lease or resist a change of landlords, or ground a cause of action on such transfer and change of landlords. *Perkins v. Langdon,* 231 N.C. 386, 57 S.E. 2d 402; Mordecai's Law Lectures, 2d Ed., pp. 596 and 597; 51 C.J.S., Landlord and Tenant, Sec. 258 (a), p. 895; 35 C.J., p. 1213 *et seq.;* 32 Am. Jur., Landlord and Tenant, Sec. 89.

This is so because such transfer of the reversion, subject to the lease, neither terminates the leasehold estate nor deprives the tenant of any of his rights in the land. 32 Am. Jur., Landlord and Tenant, Sec. 89. See also G.S. 42-8.

But a different situation is presented where the lessor under a parol lease for not more than three years transfers the reversion to an innocent purchaser for value who has no notice of the tenancy, and nothing sufficient to put him upon inquiry exists at the time of sale. In such case, while there is some authority for the proposition that the purchaser takes subject to the outstanding lease and is bound by its terms, whatever they may turn out to be (Tiffany, Real Property, 3rd Ed., Vol. 1, Sec. 110, citing *Bramhall v. Hutchinson,* 42 N. J. Eq. 372, 7 A. 873; and American Law of Property, Vol. 1, Sec. 3.59), nevertheless, by what we consider to be the better reasoned line of authority, where the lessor transfers the reversion to an innocent purchaser for value who has no notice of the tenancy, and nothing sufficient to put him upon inquiry exists at the time of the sale, the transfer destroys the leasehold estate of the tenant, is a wrong done to the lessee, and renders the lessor liable to the lessee in an action at law for damages. *Williams v. Young,* 78 N. J. Eq. 293, 81 A. 1118; *Grover v. Norton,* 183 N. Y. Supp. 731; *Raisin v. Shoemaker,* 200 N. Y. Supp. 615, affirmed 238 N.Y. 630, 144 N.E. 921. See also Annotation, L.R.A. 1915C, p. 194; 32 Am. Jur., Landlord and Tenant, Sec. 89; 51 C.J.S., Landlord and Tenant, Sec. 258.

In *Williams v. Young, supra,* the New Jersey Court, some twenty years after its decision in *Bramhall v. Hutchinson, supra* (cited by Tiffany and relied on by the defendant) had this to say: "When defendant wrongfully conveyed the land in question to an innocent purchaser for value without notice of complainant's leasehold estate, the leasehold

estate in the land was necessarily destroyed. The absolute and unrestricted title of such purchaser rendered the further existence of a leasehold estate impossible. The conveyance to the innocent purchaser was, in effect, a conveyance of the term and the reversion. Complainant thereby became entitled to recover from defendant in an action at law, . . ."

In *Grover v. Norton, supra,* it is stated: "But where a lessor transfers to an innocent purchaser for value, who had no notice of the tenancy, and nothing sufficient to put him upon inquiry existed at the time of the sale, the transfer destroys the leasehold, is a wrong to the lessee, and renders the lessor liable to the lessee in an action for damages."

This rule seems to be in accord with the letter and spirit of our registration statute, the Connor Act, adopted in 1885, now codified as G.S. 47-18. This statute provides in pertinent part as follows: "No conveyance of land, or contract to convey, *or lease of land for more than three years* shall be valid to pass any property, as against creditors or purchasers for a valuable consideration, from the donor, bargainor or lessor, but from the registration thereof within the county where the land lies; . . ." (Italics added.)

The fact that these parol leases for not more than three years (also valid as not being within the Statute of Frauds, G.S. 22-2) are excepted from the operation of the Connor Act (G.S. 47-18) is not to be interpreted as meaning that a lessee under such lease is protected at all hazards or that his rights are superior to those of a *bona fide* purchaser for value from the lessor. These short-term parol tenancies are merely exempted from the operation of the Connor Act. This being so, we look for guidance to the law as it stood prior to the passage of this Act and as it now stands where the Act has no application.

As to this, the true rule is that a *bona fide* purchaser for value without notice of outstanding equities takes title absolute. But where upon the sale of land the rights of a tenant under one of these short-term parol leases becomes involved, the facts respecting whether the lessee was or was not in possession at the time of the sale ordinarily becomes a crucial factor in determining whether the purchaser stands in the protected position of a *bona fide* purchaser for value without notice of the lease, and where the lessee is in actual possession, the purchaser ordinarily takes subject to the lease, although he has no actual knowledge thereof. Actual possession is treated as the equivalent of notice to the purchaser and as a substitute for registration. *Webber v. Taylor,* 55 N.C. 9; *Edwards v. Thompson,* 71 N.C. 177; *Tankard v. Tankard,* 79 N.C. 54; *Heyer v. Beatty,* 83 N.C. 285; *Bost v. Setzer,* 87 N.C. 187; *Johnson v. Hauser,* 88 N.C. 388; *Staton v. Davenport,* 95 N.C. 11; *Mayo v. Leggett,* 96 N.C. 237, 1 S.E. 622. See also *Allen v. Bolen,* 114 N.C. 560, 18 S.E. 964; 51 C.J.S., Landlord and Tenant, Sec. 258; *Raisin v. Shoemaker, supra;*

*Eckman v. Beihl,* 116 N.J. 308, 184 A. 430; *Huddleston v. Ward* (Ohio), 68 N.E. 2d 580; 39 Am. Jur., Notice and Notices, Sec. 18; Annotation, 74 A.L.R. 355.

It is here noted that our registration act of 1885 (G.S. 47-18) contains a proviso that in cases where deeds were executed prior to 1 December, 1885, actual possession excepted the cases from the operation of the act and stood as the equivalent of registration. Prior to 1885 in cases involving conveyance of leasehold interests in land, and fixing the rights as between the lessee and the purchaser, actual possession of the land was treated as "notice to the world of all equities in favor of the occupant." *Heyer v. Beatly, supra.*

In *Bost v. Setzer, supra* (1882), it is stated: "If for instance a person should purchase an estate from the owner, knowing it to be in the possession of a tenant, he is bound to inquire into the estate which the tenant had, and has an implied notice of the nature of the title."

But to constitute constructive notice, the possession must be open, notorious, and exclusive and existing at the time of the purchase. *Edwards v. Thompson, supra.*

The logic and fundamental fairness of this rule which protects a *bona fide* purchaser for value without notice of an existing parol lease is inescapable when we realize that in the absence of such rule, in many situations no amount of inquiry or inspection of the premises would protect a purchaser as a matter of law from these hidden equities; whereas, the rule which treats the actual, open possession of the lessee as notice to the world fully protects a lessee in possession. Besides, on principles of natural justice the burden of giving notice of these undisclosed encumbrances and equities should be placed upon him who has knowledge thereof, namely, the owner, or lessee if he has the right of possession.

The application of the rule urged by the defendant, permitting the engrafting of these hidden equities, would unduly burden land titles.

It necessarily follows from what we have said that the motion for judgment on the pleadings was properly denied.

Next is the exception based on refusal to allow the defendant's motion for judgment as of nonsuit.

It is admitted that the defendant sold the premises at the end of the first year. Therefore, decision on the question of nonsuit may be made to turn on whether the plaintiffs showed *prima facie* that the rental contract contained a covenant that the defendant would not sell the property during the three-year term of the lease. The plaintiffs testified unequivocally it was agreed that the defendant would not sell during the term. This, with the admission that the property was sold at the end of the first year, made it a case for the jury on the question of breach of contract and recovery of nominal damages at least. *Sineath v. Katzis,* 218 N.C. 740,

12 S.E. 2d 671; *Bowen v. Bank,* 209 N.C. 140, 183 S.E. 266; 15 Am. Jur., Damages, Sections 5 and 7.

We have considered the defendant's contention that part of the testimony of the plaintiff H. L. Perkins is susceptible of the inference that he claimed the lease was for three years with privilege of two more, so as to bring the contract within the Statute of Frauds and entitle defendant to judgment of nonsuit on the theory that the alleged contract is violative of the Statute of Frauds, G.S. 22-2. At most, the testimony relied on by the defendant was nothing more than an inconsistency or contradiction in the witness' testimony in chief. As to this, the rule is that it is for the jury, and not for the court, to resolve the discrepancies and dispose of the contradictions in testimony. *Maddox v. Brown,* 233 N.C. 519, 64 S.E. 2d 864.

This brings us to the exception based on the ruling of the trial court in denying the defendant's motion for peremptory instruction in his favor on the third issue.

On this issue the burden of proof was on the plaintiffs to show that the purchasers of the warehouses took title from the defendant "for value and without notice of the contract of rental with the plaintiffs for the said term of three years as said contract was described in the original complaint."

The defendant in urging that he was entitled to a peremptory instruction relies chiefly on the testimony of the witness R. H. Barbour, one of the purchasers of the warehouse property. This witness said he knew from his conversations with the defendant that the plaintiffs had a three-year lease on the property, but the witness further said the defendant told him the contract permitted him to "sell after one year." Thus, on the basis of the information of purchaser Barbour, given him by the defendant, the plaintiffs' lease was enforceable for only one year. This being so, it does not follow as the only inference deducible from Barbour's testimony that the purchasers had notice of a "contract of rental with the plaintiffs for the . . . term of three years. . . ."

But the defendant here insists that in any event the testimony of Barbour shows at least that the purchasers had knowledge of a lease agreement between the defendant and the plaintiffs, and that this knowledge was sufficient to excite attention and charge the purchasers with the duty of making direct inquiry of the lessees, and that such inquiry, if made, would have disclosed the actual terms of the contract as claimed by the lessees.

We apprehend the general rule to be, as recognized by numerous authoritative decisions of this Court, that ordinarily where a party has information which is reasonably calculated to excite attention and stimulate inquiry, he is charged with constructive notice of all that reasonable

inquiry would have disclosed, the theory being that knowledge which one has or ought to have under the circumstances is in legal contemplation imputed to him. *Ijames v. Gaither,* 93 N.C. 358; *Hulbert v. Douglas,* 94 N.C. 122; *Bryan v. Hodges,* 107 N.C. 492, 12 S.E. 430; *Rouse v. Bowers,* 111 N.C. 360, 16 S.E. 684; *Loan Association v. Merritt,* 112 N.C. 243, 17 S.E. 296; *Wittkowsky v. Gidney,* 124 N.C. 437, 32 S.E. 731. See also 39 Am. Jur., Notice and Notices, Sec. 12.

But to charge one with notice, the activating information known to the party sought to be charged must ordinarily be such as may reasonably be said to excite inquiry respecting the particular fact or facts necessary to be disclosed in order to fix the party charged with notice. 39 Am. Jur., Notice and Notices, Sec. 15; *Zeller v. Milligan,* 71 Cal. App. 617, 236 P. 349; *Anderson v. Blood,* 152 N.Y. 285, 46 N.E. 493; *Fire Asso. of Phila. v. Flournoy,* 84 Tex. 632, 19 S.W. 793.

Also implicit in the principles that underlie the doctrine of constructive notice is the concept that before one is affected with notice of whatever reasonable inquiry would disclose, the circumstances must be such as to impose on the person sought to be charged a duty to make inquiry. *Truitt v. Grandy,* 115 N.C. 54, 20 S.E. 293; *Kian v. Ketalogiannis,* 158 Va. 129, 163 S.E. 535, 82 A.L.R. 894; *Hoy v. Bramhalf,* 19 N. J. Eq. 563, 97 Am. Dec. 687; *Hood v. Fahnestock,* 1 Pa. St. 470, 44 Am. Dec. 147; *S. & E. Motor Hire Corporation v. New York Indem. Co.,* 255 N.Y. 69, 174 N.E. 65, 81 A.L.R. 1318; *Armourdale State Bank v. Homeland Ins. Co.,* 134 Kan. 245, 5 P. 2d 786; 39 Am. Jur., Notice and Notices, Sec. 12.

The gist of the defendant's contention is that the purchasers were in duty bound to go behind and make inquiry as to the truthfulness of the positive representation which admittedly the defendant made to the purchasers to the effect that he had the right "to sell the property after one year."

The plaintiffs' position *contra* is that upon the whole of the evidence it was inferable that the purchasers, not being apprised of anything calculated to excite inquiry or stimulate doubt as to the reliability of the representations made to them by the defendant, were justified in accepting as true, and acting on, the representations as made by the defendant.

And in support of the plaintiffs' position it is noted that this controverted question of whether the purchasers are chargeable with notice of the lease, as presented by the third issue, is not required to be resolved wholly and solely on the basis of the testimony of purchaser Barbour, as suggested by the defendant. Relevant facts and circumstances susceptible of substantial probative force arise from other sources. First, it is of controlling importance, as tending to support the inference that the purchasers were not charged with notice of the three-year lease, that the defendant owner, rather than the lessees, admittedly was in possession of

the property at the time of the sale. And, further, it is noted that the plaintiffs offered in evidence these portions of the defendant's answer to plaintiffs' allegations that the purchasers took title to the warehouse property as *bona fide* purchasers: ". . . It is admitted that neither the purchasers nor the defendant had notice of, nor was there in fact, any such contract between the defendant and the plaintiffs as alleged by the latter, and that the grantees named in said deed were purchasers for value, in good faith, and have retained possession thereof since their purchase."

True, the foregoing admission, contained in the defendant's pleadings, relates to the plaintiffs' allegations respecting the terms of the lease agreement as set out in the plaintiffs' amplifying amendment, upon which the fourth issue is based. Nevertheless, the admission set out in the defendant's answer relates in general terms to the lease agreement, and the admission was offered by the plaintiffs and received in evidence without qualification or restriction. We think it has probative value as bearing on the third issue as well as the fourth.

It thus appears that the evidence was not all one way on the crucial question of notice. And particularly is this so when we bear in mind, as we must, that the question here presented is not only (1) whether inquiry, if made of the lessees by the prospective purchasers, would have revealed the facts which really existed, *i.e.,* that the plaintiffs claimed under an unconditional lease for the full term of three years, with no right of sale reserved by the defendant as he claimed, but also (2) whether, acting as ordinarily prudent persons would have done, the purchasers were called upon, under the circumstances, to make inquiry of the lessees.

Manifestly, upon the record as presented the question of notice presented by the third issue was an open question for the jury, and the motion for peremptory instruction was properly overruled.

We come now to the exceptions dealing with the issue of damages. The case was tried below on the theory that if the defendant breached the lease agreement as alleged, then and in that event the plaintiffs were entitled to recover for profits prevented or lost in consequence of the defendant's wrong.

The defendant challenges this theory of the trial. He contends that profits prevented may not be made the subject of recoverable damages in a case like this one, and in connection with numerous exceptions grouped and brought forward he asserts that the trial court erred (1) in the reception of evidence tending to support the plaintiffs' claim for damages based on loss of prospective profits, and (2) in charging the jury on the theory that the measure of damages is related to the loss of prospective profits.

In resolving the legal question here presented, we recur to fundamental principles. In accordance therewith, the general rule is that a party who is injured by breach of contract is entitled to compensation for the injury

sustained and is entitled to be placed, as near as this can be done in money, in the same position he would have occupied if the contract had been performed. Stated generally, the measure of damages for the breach of a contract is the amount which would have been received if the contract had been performed as made, which means the value of the contract, including the profits and advantages which are its direct results and fruits. *Newby v. Atlantic Coast Realty Co.,* 180 N.C. 51, 103 S.E. 909; *Winston Cigarette Mach. Co. v. Wells-Whitehead Tobacco Co.,* 141 N.C. 284, 53 S.E. 885; *Troitino v. Goodman,* 225 N.C. 406, 35 S.E. 2d 277; 15 Am. Jur., Damages, Sec. 43.

It follows, therefore, that recovery may be had both for gains prevented and losses sustained by reason of the breach, including loss of prospective profits. *Troitino v. Goodman, supra; Cary v. Harris,* 178 N.C. 624, 101 S.E. 486; 15 Am. Jur., Damages, Sec. 43, and Sec. 149 *et seq.* However, to "warrant a recovery for loss of profits in an action for breach of contract, it must be made to appear that such loss of profits was the natural and proximate, not remote, result or consequence of the breach of the contract, and such as may reasonably be supposed to have been within the contemplation of the parties when the contract was made as the probable result of its breach." 15 Am. Jur., Damages, Sec. 152. See also *Wilkinson v. Dunbar,* 149 N.C. 20, 62 S.E. 748; *Cary v. Harris, supra; Troitino v. Goodman, supra.*

This is but an application of the rule enunciated and applied in the old English case of *Hadley v. Baxendale,* 9 Exch. 341, which with us through the years has been followed as the controlling guide in determining the measure of damages in breach of contract cases where special damages, arising out of special circumstances, are alleged and proved. We quote from the decision: "Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i.e.,* according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise

generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract. For, had the special circumstances been known, the parties might have specially provided for the breach of contract by special terms as to the damages in that case; and of this advantage it would be very unjust to deprive them . . ."

Under application of the foregoing principles, we think it may be stated as a general rule that the prospective profits from an established mercantile business, prevented or interrupted by breach of contract, are properly the subject of recovery when it is made to appear (1) that it is reasonably certain that such profits would have been realized except for the breach of the contract, (2) that such profits can be ascertained and measured with reasonable certainty, and (3) that such profits may be reasonably supposed to have been within the contemplation of the parties, when the contract was made, as the probable result of a breach. 15 Am. Jur., Damages, Sections 152 and 157. See also 32 Am. Jur., Landlord and Tenant, Sections 32 and 194; Annotation, 104 A.L.R. 132, p. 139; *Troitino v. Goodman, supra; Brewington v. Loughran,* 183 N.C. 558, 112 S.E. 257; *Cary v. Harris, supra; Harper Furniture Co. v. Southern Express Co.,* 148 N.C. 87, 62 S.E. 145; *Johnson v. R. R.,* 140 N.C. 574, 53 S.E. 362; *Hadley v. Baxendale, supra; Neal v. Jefferson,* 212 Mass. 517, 99 N.E. 334; *Dyal v. Wimbish,* 124 F. 464; Williston on Contracts (1937 Edition), Vol. 5, sections 1345, 1346, and 1346A; Restatement of the Law of Contracts, Vol. 1, Sections 329, 330, and 331.

In *Cary v. Harris, supra,* the owner of a hotel sued the tenant to recover unpaid rents. The tenant set up a counterclaim for damages growing out of a breach of the covenants in the lease. In support of the counterclaim and as bearing upon the measure of damages, evidence was offered concerning the prior operational experience of the hotel. The defendant testified respecting what the income was and gave her opinion as to the value of the lease the season following its breach. This Court, with *Brown, J.,* delivering the opinion, laid down the rule of damages as follows:

"The rule is, in the admeasurement of damages in a case of this kind, that the party injured may recover all the damages, including gains prevented as well as losses sustained, as were fairly within the contemplation of the parties and capable of being ascertained with a reasonable degree of certainty." (Citing cases.)

*Neal v. Jefferson, supra,* involves loss of profits for breach of lease. There the defendant breached a one-year lease of a Florida hotel and cottage. The contract was breached after one year's operation by virtue of the defendant's sale of the premises. Recovery was allowed on the basis of estimated lost profits. There it was said: "The *quantum* of such prospective profits was not so speculative or uncertain as to preclude

their recovery. . . . There was evidence of the actual receipts and expenditures during the time that the plaintiff was in possession. He testified as an expert to his opinion of what could be realized during the two following years and of the value of the leasehold estate in view thereof. Looking at the evidence of his knowledge and experience we cannot say this was wrong. . . ."

In *Dyal v. Wimbish, supra,* the plaintiff leased defendant a tobacco warehouse for three seasons. The lessee agreed to pay the lessor a specified sum per thousand pounds of all first-hand tobacco sold. Plaintiff had operated defendant's warehouse under a similar lease for four years previous. Defendant wrongfully breached the contract and refused to allow plaintiff to get possession for the 1939 season. The plaintiff was permitted to recover damages based on the loss of prospective profits and the recovery was upheld on appeal, with the Court making this observation: "There is no doubt the evidence tended to show the profits made by Wimbish from the leasing of the Planters Warehouse in previous years was properly admitted."

The defendant in urging that the evidence bearing on prospective profits should have been excluded, cites and relies on these decisions: *Sloan v. Hart,* 150 N.C. 269, 63 S.E. 1037; *Machine Co. v. Tobacco Co., supra; Brewington v. Loughran, supra; Harris v. Smith,* 216 N.C. 352, 4 S.E. 2d 880; *Steffan v. Meiselman,* 223 N.C. 154, 25 S.E. 2d 626.

The defendant places chief stress upon the decision in *Sloan v. Hart, supra,* which was an action by a lessee to recover damages for breach of a lease contract. There the Court said the measure of damages was "the difference between the rent agreed upon and the market value of the term," and went on to say: "By rental value is meant, not the probable profits that might accrue to the plaintiffs, but the value, as ascertained by proof, of what the premises would rent for, or by evidence of other facts from which the fair rental value may be determined."

However, there is a clear factual distinction between the *Sloan case* and the case at hand. In the *Sloan case,* as stated at the bottom of page 275: "There is no allegation in the complaint of any special damages, and no evidence to support the claim." In the present case there is both allegation and proof of special damages.

Similarly, upon close scrutiny the other cases cited by the defendant are found to be factually distinguishable from the case at hand. Without further discussion it is enough to say that these cited decisions may not be interpreted as committing this Court to the unvarying rule that the loss of prospective profits upon interruption or destruction of an established business is too remote or speculative to sustain recovery therefor.

It may be conceded that recovery based on the loss of prospective profits, usually being too dependent upon uncertain and changing con-

tingencies, is not allowed as a matter of course, nevertheless we adhere to the rule explained by *Mr. Justice Lamar* in the case of *Howard v. Stillwell & Bierce Mfg. Co.* (1891), 139 U.S. 199, 11 S. Ct. 500, 35 L. Ed. 147: "But it is equally well settled that the profits which would have been realized had the contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into."

We do not interpret the decisions of this Court cited by the defendants as being at variance with this rule. The rationale of the cited decisions is that when prospective profits are conjectural, remote, or speculative, they are not recoverable. 15 Am. Jur., Damages, Sec. 152. See also *Sprout v. Ward,* 181 N.C. 372, 107 S.E. 214; *Coles v. Lumber Co.,* 150 N.C. 183, 63 S.E. 736.

Accordingly, when we come to consider the defendant's numerous exceptions to the reception of evidence, the question for decision involved in most instances is (1) whether the challenged evidence comes within the bounds and limits of the approved general rule governing the allowance of prospective profits, or (2) whether it is conjectural, remote, or speculative, and therefore beyond the bounds of the rule.

The evidence bearing on the issue of damages, received, in large part, over the defendant's objections and exceptions, may be summarized as follows:

The Fayetteville tobacco market was first opened in 1946 with three warehouses: the Langdon, the Mack, and the Cumberland. None of the major tobacco companies sent buyers to the market that year. Nor were government-paid graders furnished, as was customary on established markets. The buyers who appeared were principally representatives of small, independent companies or speculators; the grading service was paid for by local contributions. The market as a whole operated in 1946 "pretty poorly." The total sales of the market were 6,420,612 pounds at an average of about 48c per pound.

The defendant owned that year only one of the three warehouses. From it he made net about $4,000. Toward the end of the year he started negotiations for the purchase of the Mack Warehouse, which was about the same size as his original Langdon house. The purchase was consummated prior to the time he concluded the lease agreement with the plaintiffs, and both warehouses were included in the lease. The two warehouses had total floor space of 94,000 square feet. This represented 69.4% of the total market floor space, and gave the plaintiffs 69.4% of

the total market selling time.  The total market selling time, as is the custom in the tobacco trade,\was allocated to the different warehouses on the basis of relative floor space.

The lease was made early in 1947.  Following this the plaintiffs spent much time, from March until the season opened in August, at the task of building up the market; they made various trips to the home offices of the leading tobacco manufacturing companies in an effort to have these companies place buyers on the market, and to Washington for the purpose of arranging for government-paid graders.  In both these undertakings the combined efforts of the plaintiffs and other interested citizens proved successful.  In addition to a number of large independent companies, these companies sent buyers in 1947: American Tobacco, R. J. Reynolds, Liggett-Myers, and China American Tobacco Company.

With the coming of these leading tobacco companies, the Fayetteville market became in 1947, the first year of plaintiffs' lease, what is known in the trade as a "stabilized market."

The plaintiff J. W. Perkins also spent much time during the spring and summer on promotional work—"drumming tobacco in about 12 or 14 counties, calling on farmers from house to house, . . ." The plaintiffs also sent out about 60,000 circulars announcing the coming arrival on the Fayetteville market of buyer-representatives of these major tobacco companies.  They also did "radio advertising—newspaper advertising, went to tremendous expense at that."

In this and other promotional work of like kind the plaintiffs incurred during the first year of operations expenses of a nonrecurring nature amounting to about $7,400.

The Fayetteville market sold during the year 1947 about 7,883,992 pounds of tobacco at an average price of about 40c per pound, as against 6,420,612 pounds for the year 1946.  The two warehouses operated by the plaintiffs, with 69.4% of the total market floor space and selling time, drew 77% of the total market sales.  The defendant's 30% share of the receipts from the two warehouses in 1947 amounted to $22,741.79. This was paid to the defendant by the plaintiffs in accordance with the lease.  After payment of this and other items of operating expense (including the nonrecurring expense items of $7,400), the plaintiffs' net profits for 1947 amounted to $23,874.08.

The foregoing line of evidence was relevant and admissible as tending to show that the plaintiffs' business, allegedly interrupted and broken up by the defendant's wrong, was (along with the Fayetteville market) an established going concern and had been successfully conducted for such length of time that the profits thereof were reasonably ascertainable. *Outcault Adv. Co. v. Citizens Nat. Bank,* 118 Kan. 328, 234 P. 988, 41 A.L.R. 194.  *Cf. Sinclair Ref. Co. v. Hamilton & Dotson,* 164 Va. 203,

178 S.E. 777, 99 A.L.R. 929; *Howard v. Stillwell and Bierce Mfg. Co.,* *supra.*

It was also in evidence that during the negotiations leading up to the consummation of the lease that the plaintiffs told defendant they contemplated building up the business to the point where the defendant's net profits would "grow all the way from $25,000 to $35,000 per season"; that the defendant "was very tickled to hear that." And while he said "he would a whole lot rather see it than hear tell of it," the evidence discloses that from his information respecting the plaintiffs and their long, successful experience in the tobacco industry, he was convinced as he put it in speaking to them: "You fellows are going to make good tenants, going to make me good renters." He told the plaintiff Newman: "I feel reasonably sure things are going to be different. I feel good about it."

This line of evidence was relevant and competent as shedding light on the extent of profits that may reasonably be supposed to have been within the contemplation of the parties, when the contract was made, as the probably result of a breach. *Hadley v. Baxendale, supra.* Also, there was evidence tending to show that the parties contemplated it would be necessary for the plaintiffs to incur during the first year substantial nonrecurring expenses, and that the profits would likely increase the second and third years.

In 1948 the total warehouse floor space of the Fayetteville market was increased from 132,436 square feet to 339,000. After the defendant's two warehouses were sold, their floor space was increased by the new owners from 94,000 square feet to 165,000. Gross sales on the Fayetteville market for 1948 were 8,612,160 pounds at an average price of about 49c, and for 1949 the gross sales were 8,348,286 pounds at an average of about 47c per pound. For the years 1948 and 1949 the Langdon warehouses, operated by the new owners, had about 48.5% of the total market floor space and sold about 48.5% of the total market sales. However, assuming that the floor space of the Langdon houses had not been increased by the new owners, but with the other competing houses increased as they were increased, the Langdon houses would have had about 35.074% of the market floor space. This evidence was relevant and admissible as tending to furnish further bases upon which to estimate prospective profits. 15 Am. Jur., Damages, Sec. 157.

It was fully developed by the testimony of numerous witnesses that the floor space increases made by the competing warehouses after the close of the 1947 season vitally reduced the relative selling time and comparative volume of sales made by the Langdon warehouses in the hands of the new owners. And these changes, including the floor-space additions made by the new owners of the Langdon houses, necessarily became vital factors in estimating the prospective profits of the plaintiffs for the

years 1948 and 1949. A study of the record leaves the impression that the jury fully understood the impact of these factors as bearing on the issue of damages.

The court permitted the plaintiffs J. W. Perkins and N. C. Newman each to testify (over objection and exception of the defendant) that in his opinion the value of the lease agreement for the years 1948 and 1949 was $41,201.83 each year, or a total for the two years of $82,403.66.

This testimony was admissible under the general rules governing opinion testimony. It is well established that the value of the use of property may be proved by the opinion evidence of witnesses acquainted with the property and the facts bearing upon its use. 20 Am. Jur., Evidence, Sec. 900; Wigmore on Evidence, Third Ed., Sec. 1918 et seq.

Here it is noted that these witnesses were subjected to lengthy cross-examinations in which it was disclosed that the floor space increases made by the competing warehouses after the 1947 season necessarily became vital factors in estimating the prospective profits of the plaintiffs for the years 1948 and 1949.

The plaintiffs were also permitted to introduce in evidence, over objections and exceptions of the defendant, various opinions of disinterested witnesses as to the fair value of the plaintiffs' lease for the years 1948 and 1949. These opinions were given by witnesses shown to have had years of experience in operating auction warehouses like the ones involved here, in the same and other tobacco belts. Each witness also stated that he was familiar with the Fayetteville market in 1948 and 1949. These opinions placed the value of the plaintiffs' lease for 1948 and 1949 at figures ranging from $27,000 to $35,000 a year.

Illustrative of this kind of evidence is the testimony of the witness Odell King, in part as follows:

"Q. Mr. King, if the jury should find from the evidence in this case and by its greater weight that Mr. Langdon entered into a contract to rent or lease his two tobacco warehouses in Fayetteville to the Perkins brothers and Mr. Newman, the plaintiffs in this case, for the tobacco marketing seasons of 1947, 1948 and 1949, upon a commission basis of 30% of the gross profits or commissions of sale, going to the owner of the warehouse, Mr. Langdon, together with 30% of the basket rentals for each of the three years, and that the plaintiffs, the Perkins brothers and Mr. Newman, for the year 1947, were in possession of these two warehouses of Mr. Langdon for that tobacco marketing season, and that during that season they grossed $74,741.16, and had expenses of $52,238.34, in which expenses they paid Mr. Langdon $22,741.79 rent, and that they had a net profit of $23,874.08, and that during that year of 1947 the Fayetteville tobacco market, that is all the warehouses had a square foot area of warehouse space of 132,436 square feet of which the two Langdon

warehouses, rented to the plaintiffs, had 69.4% of the total warehouse floor space, and that the entire market sold 7,883,000 pounds of tobacco, of which the plaintiffs, the Perkins brothers and Mr. Newman, sold approximately 77% of all tobacco sold, and that all of the tobacco sold for $2,430,000, that is the Langdon warehouses, and there was a net profit of $23,874.00 approximately, and of the expense of $52,000.00 in round figures, there was approximately $7,400 in nonrecurring expenses that they would not have to expend for the years 1948 and 1949, and that in 1948 there had been an increase of floor space of the entire Fayetteville warehouse markets from 132,436 square feet, to 339,000 square feet approximately, of which the warehouses that Mr. Langdon had leased or rented to the plaintiffs had then 48.5% of the floor space, instead of 69.4% that they had in 1947, and there was sold on the warehouses 3,900,000 pounds at 49c a pound, whereas the sale price was approximately 40c a pound in 1947, . . . and that in 1949 with the same floor space as in 1948, in the whole Fayetteville tobacco market of 339,000 square feet, the market sold 8,348,000 pounds at an average sale price of approximately 47c per pound, and of that tobacco the Big Farmers Warehouse, which was the new name of the two Langdon warehouses, leased to the plaintiffs in this case, sold 48.5% of the total amount of tobacco sold on the market; would you have an opinion, based upon your knowledge of warehouse conditions in Fayetteville during those years of 1948 and 1949, and based upon the figures which I have given you, as to your opinion, if any, satisfactory to your own mind, as to the value of the contract of the Langdon warehouses to these plaintiffs in the years 1948 and 1949?

"A. I have got one thing in mind.

"Q. Just answer the question. Do you have an opinion?

"A. Yes, I do.

"Q. What is that opinion?

"A. In consideration of the experience I have had, operating expenses, knowing what ours have been, quoting figures on what they had in 1947, their first year there, I would say from $32,000 to $35,000 each year.

"Q. Mr. King, if the jury should find from the evidence in this case and by its greater weight, all of the factual situations that I have just read to you in my previous question, but when you come to the year 1948 with this change, you would find that the floor space in the Wellons Warehouse and in the Planters Warehouse, without making any increase on the floor space in the Big Farmers Warehouse, leaving that at 94,000 instead of increasing it to 165,000, if you find with that factual situation, that the percentage of the floor space of the entire market as to the Big Farmers Warehouses that had been leased to these plaintiffs, amounted to 35.074% of the floor space, what would be your opinion upon that factual situation, if you have such opinion satisfactory to yourself and based

upon experience as to the value of the leased property to these plaintiffs for the years 1948 and 1949, based upon an average of 35.074% of the floor space?

"Q. Do you have an opinion about it?

"A. I do.

"Q. What is that opinion?

"A. Basing 48% on the first question and on this 35%, I would say from $30,000 to $33,000 each year."

This line of testimony was in substantial compliance with approved rules governing the reception of expert testimony by means of hypothetical questions. Stansbury, North Carolina Law of Evidence, Sec. 137; 58 Am. Jur., Witnesses, Sections 851 to 858; Wigmore on Evidence, Third Ed., Sections 672 to 686.

In determining the admissibility of the challenged evidence we have not overlooked these special factors: (1) that the size of the tobacco crop is controlled by government regulations; (2) that a floor price is fixed each season for the different grades and that this tends to stabilize the market price of tobacco; and (3) that State law requires warehousemen to keep and report accurate records of all sales of tobacco. See G.S. 106-457 et seq.

A careful examination of the exceptions relating to the reception of plaintiffs' evidence tending to show loss of profits leaves us with the impression that the main thread and volume of the evidence, when tested by approved rules, to which we adhere, was relevant and admissible. The deviations were slight and not of sufficient moment to upset the result reached below. Bruce v. Flying Service, 234 N.C. 79, 66 S.E. 2d 312. Verdicts and judgments are not to be set aside for mere error and no more. To accomplish this result it must be made to appear not only that the ruling complained of is erroneous, but also that it is material and prejudicial, and that a different result likely would have ensued, with the burden being on the appellant to show this. S. v. Rainey, 236 N.C. 738, 74 S.E. 2d 39; Call v. Stroud, 232 N.C. 478, 61 S.E. 2d 342; Wilson v. Lumber Co., 186 N.C. 56, 118 S.E. 797.

Also, our examination of the exceptions relating to the charge disclose no substantial merit. Judge Carr correctly charged the jury in effect that the measure of damages was the value of the contract for the unexpired term which was lost by reason of the breach, after deducting the amount the plaintiffs made from other operations in 1948 and 1949. Neal v. Jefferson, supra; Cary v. Harris, supra.

Prejudicial error has not been made to appear. While the verdict is substantial, it is sustained by the record. ·The judgment will be upheld.

No error.