TROXLER ELECTRONICS LABORATORIES, INC., Appellee,

v.

SOLITRON DEVICES, INC., Appellant.

TROXLEP ELECTRONICS LABORATORIES, INC., Appellant,

v.

SOLITRON DEVICES, INC., Appellee.

Nos. 82–2078, 82–2098.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1983.

Decided Dec. 1, 1983.

Rehearing Denied Jan. 5, 1984.

Peter M. Foley, Raleigh, N.C. (John N. Hutson, Jr., Moore, Ragsdale, Liggett, Ray & Foley, P.A., Raleigh, N.C.), for appellant in No. 82–2078 and for appellee in No. 82–2098.

Michael T. Medford, Spartanburg, S.C. (Manning, Fulton & Skinner, Raleigh, N.C., on brief), for appellee in No. 82–2078 and for appellant in No. 82–2098.

Before RUSSELL and SPROUSE, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

DONALD RUSSELL, Circuit Judge:

This is a breach of contract action. The plaintiff Troxler Electronic Laboratories, Inc. (hereafter "Troxler") entered into a contract with Solitron Devices, Inc. (hereafter "Solitron") whereby Solitron agreed to manufacture and sell to Troxler certain quantities of three custom-made micro-electronic components to be used by Troxler in the production of a new and improved Series of nuclear gauges (the "3400 Series") for the measurement of the moisture content and density of soil for construction and agricultural purposes. At the time, Troxler was the leader in the manufacture and sale of such gauges, having approximately 75% of the world market. This new Series was intended to replace an existing Series (the "2400 Series") and was thought to involve lower costs of production for Troxler as manufacturer and lower costs of operations and enlarged use for the purchaser or user. Because of its improvements, the 3400 Series was expected to command a higher price and to provide a substantially greater profit for Troxler than the existing 2400 Series.

A basic part of this new Series was a type of integrated circuit known as a CMOS device or chip. While such chips were standard items on the electronics market, their combination in the new Series planned by Troxler was unique. Troxler therefore prepared "logic drawings" of the specific device in the combination it required for its gauge and solicited bids therefor on a custom basis. Solitron responded with a quo-

tation. Negotiations began between Troxler and Solitron pursuant to that bid. There was testimony that in these negotiations Troxler advised Solitron of the purposes for which it sought the article, how the article was to be used, the need for prompt production of its new Series in order to secure a competitive advantage in the market through early introduction of the Series, and the economic benefits it hoped to achieve in the shift to the new Series. As a result of these negotiations, Troxler issued to Solitron its purchase order dated November 2, 1972, which was accepted by Solitron on November 9, 1972. The purchase order as accepted included specific dates for delivery of both prototypes and finished products. Solitron in its acceptance had lengthened the dates for delivery of both prototypes and the final product. Solitron made no other change in the order as submitted by Troxler.

None of the delivery dates fixed by Solitron in its acceptance were met. The District Judge found that "[w]hen informed of Troxler's concerns over delays [in such deliveries], Solitron continually provided Troxler with expected dates of completion that were not only unduly optimistic, but probably knowingly and falsely so." During these periods of delay, Solitron also made of Troxler a request for a price increase of almost 100% in the purchase price of the articles to be delivered and Troxler contends that, in making such request, Solitron implied it would not make delivery in the absence of such increase. This request or demand was rejected by Troxler. Finally, in March 1975, Solitron made small partial deliveries of the articles purchased of it by Troxler; but, without further compliance it completely repudiated its contract in September, 1975 by announcing that it would no longer manufacture custom chips.

When Solitron repudiated its contract, Troxler redesigned its new Series in order to secure substitute standard parts which had been developed and had become available during Solitron's long delay in performing its contract. Troxler then filed its action to recover for damages arising from Solitron's breach of its contract. The District Court, after a full evidentiary trial without a jury, found that Solitron had breached its contract of sale with Troxler, awarded recovery by Troxler for various items of damages it found Troxler had sustained as a result of such breach, but denied recovery by Troxler for lost profits as an item of damages. Solitron has appealed the finding of contract breach and, assuming there was a breach, it has challenged the grant of the several items of damages in favor of Troxler; Troxler has cross-appealed the denial of lost profits as an item of damages recoverable by it in this action. We affirm in part and reverse in part, and remand for additional findings.

We address first the appeal of Solitron. We begin by noting that Solitron does not seriously contest the finding that it breached the contract. Thus, after conceding in its brief that it "did not meet the exact time requirements of the original purchase order," an act which it admits may be "considered a breach of the contract" by it, and while disclaiming any purpose on its part to "offer ... excuses as to why the prototypes were not submitted to the Plaintiff on February 2, 1973," it argues that Troxler suffered no damages from such breach. In effect, Solitron's appeal is directed not at a finding of a breach of the contract on its part but at the various items of damages found by the District Court in favor of Troxler. Unquestionably, the propriety of such allowances of damages present difficult, at times even complex, disputed factual issues. The District Judge, however, painstakingly analyzed the evidence, considered the evidence offered by both Troxler and Solitron, and resolved these disputed factual issues. We may have reached a different conclusion on the facts had we been the trier of first instance, but that is not our province. We can only reverse if the factual determinations by the District Judge lack substantial support in the record and are clearly erroneous. We find no such clear error and accordingly affirm those damages findings of the District Judge which are challenged on this appeal by Solitron.

We turn now to Troxler's cross-appeal complaining of the denial of lost profits as an item of damages. In essence, Troxler's claim is that because of Solitron's breach of contract and the resulting twenty-month delay in introducing the 3400 Series gauges, Troxler lost the higher margin of profit which the more advanced 3400 Series enjoyed, due to lower production costs, over the existing 2400 Series. Once the 3400 Series finally came onto the market during 1975–76, the 2400 Series was phased out of production. Troxler contends that sales figures for the 3400 Series when actually introduced furnish a reliable means of calculating sales and profitability for those models had they been available during 1973–75 as originally planned. The District Court disallowed the calculations of lost profits under this formula, basing its denial on alternative grounds. It first found that Troxler had "failed to show its damages to a reasonable degree of certainty." However, it did not support this conclusory statement with any specific findings of fact. Rather, it declared alternatively that lost profits were not recoverable because "[t]here is no indication that Solitron agreed, *at the time the contract was created*, to accept liability for Troxler's lost profits," and it considered the attempt of Troxler to recover such lost profits to be an "attempt to modify the contract's requirements *ex post facto*." (Italics in the original)

█ The parties seemingly agree that the right of Troxler to recover "lost profits" is controlled by the law of North Carolina. The recovery of lost profits under North Carolina law depends on whether such profits can qualify as "consequential damages" under N.C.Gen.Stat. § 25–2–715(2)(a) (1965), which defines such damages as "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." The North Carolina Comment to such statute declares that "[t]his section generally restates prior North Carolina law," and observes that under North Carolina common

law consequential damages "which are within the contemplation of the parties" were recoverable by the buyer. As the Comment suggests, North Carolina cases decided prior to the adoption of the Uniform Commercial Code adhered to the rule of *Hadley v. Baxendale,* 9 Exch. 341, 156 Eng.Rep. 145 (1854). *See Perkins v. Langdon,* 237 N.C. 159, 74 S.E.2d 634, 643–44 (1953).

Two interpretations of *Hadley v. Baxendale* have, however, been advanced. The more restrictive "tacit agreement" test requires the parties to have contemplated specifically that consequential damages might result, and that the defendant have actually assumed the risk of those damages. The more recent trend in the cases, however, places upon the defendant the risk of such consequential damages that "reasonable men in the position of the parties would have foreseen as a probable result of breach," without any requirement of actual consideration or assumption of such damages by the parties themselves. 5 A. Corbin, Contracts § 1010 at 79 (1964). *See* J. White & R. Summers, Uniform Commercial Code 388–91 (2d ed. 1980). Prior to the enactment of the U.C.C. in North Carolina, in *Troitino v. Goodman,* 225 N.C. 406, 35 S.E.2d 277, 281–82 (1945), the North Carolina Supreme Court appears to have adopted this more recent trend in the application of *Hadley* by accepting the test as set forth in Section 330, Restatement of Contracts (1932), which allows damages for "those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made."

If North Carolina courts have in effect adopted the rule as stated in Section 330, it is easy to deduce the North Carolina rule on lost profits. Comment a. to § 330 declares unequivocally that the defendant need not "have had the resulting injury actually in contemplation or [have] promised either impliedly or expressly to pay therefor in case of breach" in order for lost profits to be recoverable. Comment c. follows by indicating that a seller usually has reason to foresee that the buyer will resell goods at a

"reasonable profit," and that failure to deliver as agreed will deprive the buyer of that profit. Accordingly, there would seem to be no doubt which reading of *Hadley v. Baxendale* North Carolina intended to govern, assuming it was adopting the rule as stated in § 330 of the Restatement of Contracts.

North Carolina law under the U.C.C. follows the trend in the case law as illustrated by *Goodman.* In the U.C.C. Official Comment attached to N.C.Gen.Stat. § 25–2–715, the drafters explicitly rejected the "tacit agreement" theory in favor of a reasonable foreseeability test, Comment 2, and stated that "[i]t is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part." Comment 3. And this seems to have been the ruling of such North Carolina appellate courts as have had occasion to apply the Section. In *Rodd v. W.H. King Drug Co.,* 30 N.C.App. 564, 228 S.E.2d 35, 38 (1976), the court recognized that consequential damages for operating losses which a defendant "reasonably could have foreseen" are recoverable under § 25–2–715. Our own prior interpretations of North Carolina law are in accord. *See Gurney Industries, Inc. v. St. Paul Fire & Marine Ins. Co.,* 467 F.2d 588, 598 (4th Cir. 1972).

Since the District Court's denial of damages for lost profits rested in part on the assumption that Solitron had to *agree* to assume that liability, we must reverse, and remand for determination of Solitron's consequential damages liability under the "reasonable foreseeability" test, which we believe to be the controlling North Carolina rule.

If the District Court finds that Solitron should reasonably have foreseen that Troxler would suffer a loss of profits from its breach, it must further determine whether those damages were sufficiently specific to permit recovery. While the District Court held in the alternative that Troxler had "failed to show its damages to a reasonable degree of certainty," it offered, as we have already observed, no explanation for this bare conclusion, and we can hardly deter-

mine whether the "clearly erroneous" rule should insulate this finding of fact without some insight into the District Court's reasoning. We decline to perform the task of calculating damages ourselves, as that factual issue is primarily the responsibility of the District Court, but we note that the U.C.C. Official Comment to N.C.Gen.Stat. § 25–2–715 rejects any need for "mathematical precision," accepting that "[l]oss may be determined in any manner which is reasonable under the circumstances." Comment 4. *See also Republic National Life Insurance Company v. Red Lion Homes, Inc.,* 704 F.2d 484, 489 (10th Cir.1983); *Certain-Teed Prod. Corp. v. Goslee Roofing & S.M., Inc.,* 26 Md.App. 452, 339 A.2d 302, 317 (1975). Troxler's own calculations of lost profits may be exaggerated, but it does not follow that Troxler's lost profits, if any, are not to be calculated at all.

Accordingly, we affirm the judgment in Solitron's appeal (No. 82–2078), and reverse on Troxler's cross-appeal (No. 82–2098), and remand for further proceedings consistent with this opinion.